## BOARD OF DRAINAGE COMMISSIONERS OF JACKSON COUNTY DISTRICT NO. 2 v. KARR & MOORE *et al.*

1. Where bidders for the work of draining lands in a drainage district accompanied their bid with a certified check which was payable to the drainage board and which was not to be cashed unless the bidders failed to give bond in the event the contract was awarded to them, the drainage commissioners were not authorized to collect said check and appropriate the proceeds to the use and benefit of the drainage district, unless the board accepted the competitive bid of the makers of the check, and the bidders refused to execute a contract in accordance with

the terms of their bid, or, after executing such contract, failed to give bond for its faithful performance.

2. When the board of drainage commissioners of a drainage district advertise for bids for the work of draining the lands within such district, and receive bids therefor based upon the complete survey, plans, and specifications for such work, prepared by the engineer and viewers of the district, the commissioners cannot make material alterations in the survey, plans, and specifications, accept a modified bid of one of the bidders based upon such alterations, and enter into a contract with such bidder for the doing of such work in accordance with the terms of such modified bid, without readvertising for bids and reletting such work.

(a) The drainage commissioners were not authorized to make material changes in the complete survey, plans, and specifications for such improvement, and then enter into a contract with one of the bidders for such work, based on such changes, without readvertising for bids, by reason of a provision in the specifications that the "engineer may at any time make any changes in the location, form, dimensions, grade, slopes, or excavation and embankments, the depths or widths of the ditches, or other work, and may make variations in quantities of work to be done, either before commencement of the work or during its progress, without thereby altering or invalidating any of the ratios of pay therein named, or this contract in any other respect; provided such changes shall not increase or reduce the total contract price more than 15%, or materially change the general character of the work, so as to make necessary the installation of different equipment," this provision, if legal, referring to changes which can be made after contracts for these improvements have been made, and not to alterations in the complete survey, plans, and specifications which can be made before such contracts are let upon competitive bids.

3. Under the drainage act, there must be a final, valid, and enforceable contract before the successful bidder is required to give a bond for the faithful performance thereof.

(a) To be final, an agreement must comprise all the terms which the parties intend to introduce in it; and where it is evident from a written instrument that the parties contemplated that it was incomplete and that a binding agreement would be made subsequently, there is no agreement.

(b) The instrument executed between the drainage board and the plaintiffs expressly declaring that it is only a tentative contract and that a contract in proper and legal form and more in detail is to be executed after changes in the work have been made by the engineer of the drainage district, and a legal order has been obtained from the court authorizing the same, such instrument does not amount to a complete, final, and binding agreement.

(c) Failure of the plaintiffs to give bond for the faithful execution of such incomplete contract did not work a forfeiture of said check so given to the drainage board to insure the giving of a bond by them for the faithful performance of their contract awarded to them for the draining of the lands in the district.

4. Under the above rulings, a verdict in favor of the plaintiffs was de-

manded; and it is therefore unnecessary to consider the assignments of error upon instructions given to the jury by the court, and upon the court's refusal to rule out certain evidence.

No. 3904. JANUARY 17, 1924.

Equitable petition. Before Judge Fortson. Walton superior court. June 15, 1923.

The Board of Drainage Commissioners of Jackson County Drainage District No. 2 advertised for bids for the doing of the work of draining said district. Bids were to be submitted to this board on April 12, 1918. The successful bidder was to give bond for the faithful performance of this work. Each bidder was required to deposit with the board with his bid a certified check for $1000 on some good and solvent bank, to be forfeited if he failed to make the contract with the board for the doing of said work and to give the bond required for the faithful performance of his contract. Karr & Moore submitted a bid for said work, and deposited with the secretary of said board their certified check, dated April 11, 1918, drawn on the Union Banking Company, payable to the order of the secretary of said board. On this check was this indorsement: "This check is not to be cashed unless Karr & Moore fail to give bond in the event of their being awarded the contract for the Pendergrass Drainage District." This indorsement was signed by the secretary of the drainage district. All bids, including that of Karr & Moore, submitted in response to this advertisement, were rejected by the board. The board again advertised for bids for said work, to be submitted on May 3, 1918. Karr & Moore, in response to this second advertisement, submitted their bid for the doing of this work.

Karr and Moore filed their equitable petition against the Union Banking Company and the commissioners in their official and individual capacities, and made, in addition to the above facts, these allegations: Said check should have been delivered up to them when their first bid was rejected. All bids for said work submitted in response to the second advertisement were rejected by the board; but through their neglect they did not call for or get their check. Subsequently they took up the matter privately with the board, and after considerable changes in the specifications, making the ditches much smaller and other changes, they entered into a tentative agreement in writing with the board, by which they were to do the drainage work entirely independent of any

former bid for the work and the conditions of their former bid. At the time of entering into said tentative agreement it was expressly understood that the check was to be returned to them. They went to the office of the attorney of said board to get the check, but he was not then in his office, which was closed and to which he would not return for several days. For this reason their check was not returned and was afterwards overlooked by them. The tentative contract between them and the board was not completed, petitioners refusing to give the bond or mortgage called for in the contract, for the reason that it was discovered that the board could not comply with their part of the agreement. The drainage bonds had not been validated, and the board could not sell them to raise funds to pay for said work, because of certain war rules and regulations of the Federal government. They had no other way of raising money for that purpose. The board has twice made demand on the bank for the payment of the check, which has not been paid. The bank refuses to pay said sum of $1000 over to petitioners, or to give them credit for it on claims the bank holds against them. At the time the bank certified the check, they borrowed the sum of $1000 from the bank, executing their promissory note therefor, due one day after date, which is now held by said bank and is unpaid; and they deposited said sum subject to said check. When the bids made by them for said work were rejected, the check automatically reverted to them. For these reasons the check became void, and the bank has no right to pay it, but should refund the money held to pay it. The check is not collectible by said board or by any one else, being made payable to a purported corporation that did not exist. They prayed that the bank be enjoined from paying the check; that the sum of $1000 be declared to be their funds; that the check be declared void; and that the bank be decreed to credit the $1000 on said note held by it.

By an amendment plaintiffs struck from their petition the commissioners as individuals and proceeded against them only officially. They alleged that the tentative agreement referred to in their petition was in fact a tentative bid made by them, entirely different from the work described in the advertisements for bids and in the specifications of the engineer and viewers whose duty it was to prepare maps and plans of said district, and entirely different

from the former specifications made and filed as required by law. The private bid made by them specified certain work or drainage which was the substantial cutting down of the main ditch of some ten feet in width, and the leaving out of several of the laterals or drain ditches. This bid was not a competitive bid, and no legal contract could have been based thereon, and no legal assessment to pay for the work could have been made by the commissioners. Their check for $1000, deposited with the commissioners in response to advertisements for bids on said project, was based on the terms of said advertisements for competitive bids made on the whole work and on the terms of the law governing the commissioners in letting the work, and had no reference to the private bid made by them on different specifications without advertisement for bids and without compliance with the law in regard to letting the work.

In their answer the board of commissioners admitted the publication of the advertisements mentioned in the petition, and the rejection of all bids in response to the first advertisement. They denied that the check of plaintiffs should have been delivered to them on the rejection of their first bid. They alleged that by express agreement between them and plaintiffs said check was to be held by the board, as it was the purpose of plaintiffs to submit another bid when advertisement therefor was made by the board; and that when the second advertisement was made, bids, including that of plaintiffs, were made in response thereto on May 3, 1918; but it was denied that any of said bids were rejected at this time. On that day the board adjourned to meet at Pendergrass on May 11, 1918, to consider said bids. The second bid of plaintiffs was not accompanied with a check, because they knew that their check theretofore deposited was being retained for the purpose of their second bid. Plaintiffs appeared at said adjourned meeting, and modified their bid submitted at the regular meeting by agreeing to complete the entire improvement for $70,000; and thereupon plaintiffs and the board entered into a written contract on May 11, 1918, whereby plaintiffs were to use two boats in said work, one to start on one section of the work and the other on another section. Said work was to begin immediately. Plaintiffs represented that they had the boats ready to begin said work, and would at once ship the same and direct them, preparatory to start

dredging at the places on the two sections of the work agreed upon, and begin dredging by Aug. 1, 1918. At the time of making said contract plaintiffs suggested, to save the expense of a surety bond and give the district the benefit thereof, that they would give a mortgage on said boats when they were so erected, to secure the bond for the faithful performance of their contract, and that their check was to be retained until said bond was given, and that on failure to give said bond said check became payable. After making said contract on May 11, 1918, many months elapsed, and said boats had not been placed in said district for the performance of said work. Said contractors have not been seen or heard from during all these months, and the board could not get any response from them until the check was presented to the bank for payment, when the indorser on the note given to secure the check finally got plaintiffs to come and see about said check in an effort to make some arrangement to have the same released. At no time did plaintiffs contend that said check was not given to the board as a guarantee of the performance of their contract. Defendants denied all allegations to the contrary. Plaintiffs failed and refused to perform their contract and give the bond they agreed to give. It was denied that their failure to perform the contract was attributable to the board's inability to comply with its part of the agreement for any reason alleged by plaintiffs. By failure of plaintiffs to perform their contract the board was forced to begin advertising for bids, which was done in terms of the law; and the lowest responsible bid to do the identical work plaintiffs were to do was $13,000 in excess of the amount for which plaintiffs contracted to do the same. Said board then entered into a contract to do said improvement for the sum of $83,000; and by reason of the breach of their contract by plaintiffs the board suffered actual damages in the sum of $13,000, which they plead as a set-off against plaintiffs in this case and pray judgment therefor. The board further alleged that the landowners in said district had paid in about $52,000 to pay for said work, and that bonds were sold in the county to cover the balance due on said work, clearly showing the ability of the board to carry out its contract with plaintiffs. The board demanded payment of said check because plaintiffs had failed and refused to perform any part of their contract. Plaintiffs and the bank are liable to the board for the payment of said check.

On the trial of the case the bids of plaintiffs of April 12, 1918, and May 3, 1918, were put in evidence by them. The bid of May 3, 1918, is as follows: "Plan No. 1.—We will cut the ditch as first plans for 12½c per cu. yd. Plan No. 2.—We will cut the ditch above the R. R. as laid out first for $32,000.00, the part below the Railroad, including Walnut River as first plan of 25 ft. bottom and changing at station 433 to 704 to 40 ft. bottom and 1 foot deeper than plans, for $48,000.00. This not include O'Possum and Doster's Creek. Plan No. 3.—We will cut the ditch with the proposed 10% decrease for 13c per cu. yd. We will not bid on one half. This bid covers the whole work, and not on parts separately. We will not cut lower half unless we have upper half of work. Will put machine of 50-ft. boom on Allen's Fork first, and then build on Walnut River."

Plaintiffs also introduced in evidence the contract of May 11, 1918, as follows: "Georgia, Jackson County. This contract and agreement this day made and entered into witnesseth: That the Board of Drainage Commissioners of Jackson County Drainage District No. 2 have this day let the contract to Karr & Moore, a firm composed of J. P. Karr and Mart P. Moore, to do the dredging of Middle Oconee River and its tributaries as planned and specified by Will D. Alexander, at and for the price and sum of $70,000, $30,000 for that above the Gainesville Midland Ry., and $40,000 for all that below the said railroad. The dredging is only to extend up O'Possum Creek to within near upper end as shown on the map and profile, and up Doster's Creek to within near the upper end as shown on map and profile. Two boats are to be used on this work, one to begin at the upper part of Allen's Fork as shown on map, and the other at the upper part of Walnut River as shown on map and profile. This work is to begin immediately. It is understood that this is only a tentative contract, and one in proper and legal form and more in detail is to be signed and executed when proper changes are made by the civil engineer and such legal order obtained by the court authorizing the same. Witness our hands and seals, this May 11, 1918.

"Attest:     " (Signed) Jackson County Drainage Dist. No. 2.
                    "By P. J. Roberts, Chairman, L. S.
                    "J. P. Karr and Mart P. Moore, L. S.
                    "By Mart P. Moore."

M. P. Moore, one of the plaintiffs, testified that he was present on April 12, 1918, when the bid of plaintiffs of April 12, 1918, was tendered to the board, and was also present on May 11, 1918, when their last bid was tendered to the board. Neither of these bids was accepted. This check for $1000 was put up when the first bid was submitted. When their first bid was rejected the commissioners told the bidders that other bids would be advertised for. They agreed that this check should be held to accompany their second bid. The board met on May 3, 1918. On that day plaintiffs put in another bid. It was not accepted. At this time the board said they would hold up checks and bids for a few days. The bids were made upon specifications and map on record in court. The commissioners told him at this second meeting that they would meet on a certain day at Pendergrass. He went over there on that day. They were trying to let the work. The day the board met at Pendergrass he made a kind of private bid. The board offered him so much money, and he offered to do so much work. Plaintiffs offered to dig the upper end of said ditch and go up laterals as far as the water on each dam would carry them. Above that was to be cut off. Below the railroad no part of the top was to be wider than 40 feet. The attorney for the board said he would have to get an order from the court to do that. The specifications were to be changed afterwards, provided the court permitted. The upper ends of all the laterals were to come off, and the lower end of the ditch was to be changed from 55 feet top to 40 feet top. Their bid of May 11, 1918, was conditioned upon the court making all this legal. (Cross-examined.) After refreshing his recollection from plaintiffs' bid of May 3, 1918, the width of the ditch was to be changed, and that was all the change that was to be made in that bid, which was not accepted. The upper ends of the laterals were to be cut off in their bid of May 11, 1918. He then modified plaintiffs' bid by having certain work cut out, from $32,000 to $30,000 for certain work, and from $48,000 to $40,000 for that below the railroad.

J. P. Karr, one of plaintiffs, testified that he was present at the meeting of May 11, 1918. Had frequent talks with the board. Plaintiffs insisted that the board get the necessary order from the court making this a legal contract as provided for. They also insisted the board get an order from the national govern-

ment to sell their bonds, so that the money might be provided in case they got the order from the court to change the original specifications. They had no such order, and had not applied to the Federal government for authority to sell their bonds.

Plaintiffs introduced the minutes of the board of May 11, 1918, which are as follows: "The Board met at 10 o'clock a. m. on this day and date, according to adjournment, to further consider and pass upon bids heretofore received for the consideration of the proposed improvements in Jackson County Drainage District No. 2. W. S. Murphy, Superintendent, met with the Board, and acted in an advisory capacity to the board. On account of the scarcity of labor, the enlistment and drafting in the Army of skilled workers engaged in the dredging business, the statement of the Civil Engineer, the [they] several times advertised for the letting of the contract and the failure to receive bids within the original estimated cost on account of general war conditions, the Board finds as good and satisfactory for the conclusion and determination that the original estimate was erroneous, and therefore finds it necessary to consider and entertain bids that exceed the estimated cost. Karr & Moore modified their bid heretofore made, by bidding $70,000 to complete the entire construction of the proposed improvements, with the condition that the Board do not require a surety bond, but instead bidders would secure the bond by mortgaging the two boats with which they proposed to do said work. It was moved, seconded, and carried that the bid of Karr & Moore, being the bid of the lowest responsible bidder, be accepted by the Board, and that the Chairman of the Board be authorized to enter into a tentative contract with Karr & Moore for the construction of the proposed improvements, and that a formal contract and in detail be executed when proper changes are made by the Civil Engineer and legal steps taken and Karr & Moore build said boats on said streams at the places where said work is to begin and shall furnish the Board with a bond in the sum of seventeen thousand five hundred dollars, secured by mortgage on said boats. The certified check of $1,000 deposited with the board by Karr & Moore to be held by the Board until said mortgage bond is furnished the Board."

The defendants introduced testimony tending to show these facts: None of the bidders were present on May 11, 1918, except

plaintiffs. Plaintiffs agreed to modify their bid by reducing it from $80,000 to $70,000, if the board would not require them to go up the lateral streams except to the distances mentioned in the contract, and if the board would not require them to give a surety bond. Moore said he had one boat not in use that he could start moving immediately, and another which he could move in about two weeks. Plaintiffs were to give their bond secured by a mortgage on these boats to the board, when they got them moved and put up ready for ditching, to secure the performance of their contract. He stated that the plaintiffs would be in shape to start dredging on August 1st. The provision in the contract that it was "only a tentative contract, and one in proper and legal form and more in detail is to be signed and executed when proper changes are made by the civil engineer and such legal order obtained by the court authorizing the same," was inserted therein, not at the suggestion of plaintiffs, but at the suggestion of the attorney for the board, who thought it would take an order of the drainage court to change the estimate of the engineer. The attorney afterwards decided that this was not necessary, but reached the conclusion that the commissioners themselves, in their discretion and by proper recitals, could do so. Such order was never obtained. The attorney for the board tried to get plaintiffs to agree upon the details of the contract, which they failed to do. Plaintiffs gave no reason for failing to move their boats immediately after this contract was signed. The attorney for the board told plaintiffs that it was not necessary to obtain said order, and that all the board wanted was for them to move their boats and start the work, and that the board was ready to enter into a contract with them if they would give a surety bond; and Karr said he did not want to do that. The bids submitted on May 3, 1918, were based on a change in the width of the main ditch from 55 feet to 40 feet. This change was only for a very short distance in the main part of the river. On Oct. 4, 1918, the contract between the board and Thompson & Moseley was entered into for this work. They were to do it at 12 cents a yard. The laterals were left off in the contract with them. Taking out these laterals was in accordance with the first specifications. The original specifications did not show the width or length of the ditch. These were in the profile. Plaintiffs were to give a mortgage on their

boats instead of a bond to secure their performance of their contract. On Sept. 6, 1918, plaintiffs wrote the Union Banking Company that they were ready and willing to comply with their contract with said district, and had already entered into a contract with said district, and for this reason they notified the bank that said check was not to be cashed and that they would return the check to the bank.

On May 29, 1918, the engineer wrote to Moore, one of the plaintiffs, advising the latter that he had received a communication from the attorney of the board, asking the writer to meet Moore in the attorney's office as early as he could, "to complete the details of the contract for the work." On June 13, 1918, the engineer wrote to Moore that he had not heard from Moore as to when the latter would be ready to go to Jefferson to complete the contract. Defendants introduced the minutes of the meeting of the board on April 12, 1918, containing a resolution rejecting all bids. This resolution recites that all bidders were present and informed of the exact time of the next letting; and that "it was agreed that the certified checks deposited should be retained by the board to accompany the bid of such proposed contract at the next meeting on May 3, 1918."

It was agreed that under the contract with Thompson & Moseley, of Oct. 4, 1918, the contract price of this work was $83,000.

In rebuttal Moore testified that plaintiffs went to Jefferson in September, 1918, to insist on getting a legal contract. They wanted a court order passed. Plaintiffs introduced the specifications for this work, in which it is provided that the "engineer may at any time make any changes in the location, form, dimensions, grade, slopes or excavation and embankments, the depths or widths of the ditches, or other work, and may make variations in quantities of work to be done, either before commencement of the work or during its progress, without thereby altering or invalidating any of the ratios of pay therein named or this contract in any other respect; provided such changes shall not increase or reduce the total contract price more than 15%, or materially change the general character of the work, so as to make necessary the installation of different equipment." The engineer for the defendants testified that the changes made in the work exceeded 15%. The reduction in the work amounted to 146,939 yards and

exceeded 15% by nearly 20,000 yards. The reduction included the lateral ditches, and in the contract with the plaintiffs the lateral ditches were not included. These ditches did not amount to 20,-000 yards. The change in the contract price was 12%.

The jury returned a verdict for the plaintiffs. The commissioners moved for a new trial on the general and on various special grounds. The court overruled their motion, and error was assigned on this judgment.

*Orrin Roberts* and *Jere S. Ayers,* for plaintiffs in error.

*R. L. & H. C. Cox,* contra.

HINES, J. (After stating the foregoing facts.)

1. The deposit by plaintiffs with the board of drainage commissioners of their check was to insure the execution of a bond by the contractors for the faithful performance of such contract as might be entered into between these parties for this work in accordance with the terms of the drainage act. Acts 1911, pp. 108, 120; 1 Park's Code, § 439(u). The board of drainage commissioners would not be authorized to collect the check, and appropriate the proceeds to the use and benefit of the drainage district, unless the board accepted the competitive bid of plaintiffs, and the latter had refused to execute a contract in accordance with the terms of their bid, or after executing such contract had failed to give bond for the faithful performance of their contract. Without acceptance of their bid, and their refusal to make a contract in accordance with its terms and in compliance with this law, and their failure to execute a bond for its faithful performance, there could be no forfeiture of their check; and the drainage board could not collect it and appropriate its proceeds.

2. The drainage act of 1911 (Acts 1911, pp. 108, 114; 1 Park's Code, § 439(i)) provides, that, after a drainage district is established, the drainage court shall refer the report of the engineer and viewers back to them to make a complete survey, plans, and specifications for drains, levies, or other improvements. After a complete survey, plans, and specifications for the work are made, the board are required to give notice "for two consecutive weeks in some newspaper published in the county wherein such improvement is located, if such there be, and such additional publication elsewhere as they may deem expedient, of the time and place of letting the work of construction of said improvement, and in such

notice they shall specify the approximate amount of work to be done and the time fixed for the completion thereof." On the day appointed for the letting of the work the commissioners and the superintendent of construction shall "let to the lowest responsible bidder, either as a whole or in sections, as they may deem most advantageous for the district, the proposed work. No bid shall be entertained that exceeds the estimated costs, except for good and satisfactory reasons it shall be shown that the original estimate was erroneous. They shall have the right to reject all bids and advertise again the work, if in their judgment the interest of the district will be subserved by doing so. The successful bidder shall be required to enter into a contract with the board of drainage commissioners and to execute a bond for the faithful performance of such contract, with sufficient sureties, in favor of the board of drainage commissioners for the use and benefit of the levee or drainage district, in an amount equal to twenty-five per centum of the estimated cost of the work awarded him." Acts 1911, pp. 108, 120, 1 Park's Code, § 439(u).

Bidders make their bids based upon the complete survey, plans, and specifications called for by the above provision of the act. Bids thus made are to be accepted or rejected by the commissioners and the superintendent of construction. After the commissioners advertise for such bids and bids are made, the commissioners cannot reject all bids and materially alter the terms of a bid, and, after making such alteration, enter into a contract with one of the bidders for the construction of the proposed improvement. The commissioners cannot make changes in the plans and specifications of the proposed project which in substantial respects vary its character and materially affect its cost; and they cannot, without further advertising, lawfully accept new proposals for such construction and award a contract therefor. In *Manly Building Co.* v. *Newton,* 114 *Ga.* 245 (40 S. E. 274), this court, in dealing with a contract let for the erection of a court-house, said: "When an ordinary advertises for sealed proposals for the erection of a court-house, and, after receiving, considering, and rejecting all such as are presented to him, makes changes in the plans and specifications of the proposed building, which in substantial respects vary its character and materially affect its cost, he cannot, without further advertising, lawfully accept new pro-

posals for the construction of the building, and award a contract therefor." The principle ruled in that case is applicable to letting contracts under the drainage act for the purpose of constructing drainage projects. Plaintiffs, in response to the advertisement of the commissioners inviting bids for this work, submitted a bid in which they proposed to do this work for $80,000, in accordance with the plans and specifications prepared by the engineer and viewers. They afterwards modified their bid by proposing to do the work for $70,000 in view of certain changes made in the plans and specifications, upon the condition that the board would not require them to give a security bond, but would accept from them a bond, secured by their mortgage upon the two boats which they would use in doing said work, conditioned for the faithful performance of their contract. Thereupon the board passed a resolution authorizing its chairman to enter into a tentative contract with the plaintiffs for the construction of the proposed work, based upon their modified bid, and permitting plaintiffs to give their bond, secured by a mortgage on said boats, conditioned for the faithful performance of their contract, instead of a bond with surety, and further providing that a formal contract in more detail would be executed when proper changes had been made by the civil engineer in the plans and specifications of said work; and that plaintiffs should furnish a bond in the sum of $17,500, secured by a mortgage on said boats, conditioned for the faithful performance of such formal and fuller contract. This resolution further provided that the certified check for $1000 deposited with the board by plaintiffs was to be held by the board until said mortgage bond was furnished by plaintiffs. In pursuance of this resolution, plaintiffs entered into a tentative contract for the doing of said work, which is set out in full in the statement of facts. Under these circumstances the tentative contract let by the commissioners for draining this district was illegal and void, as the commissioners were without competent authority to make it in the manner in which it was executed. *Bird* v. *Franklin*, 151 *Ga.* 4 (5*b*) (105 S. E. 834). The plaintiffs could not be required to execute a bond for the faithful performance of an illegal and void contract. Bidders are only required to give bonds for the faithful performance of contracts for the construction of these drainage districts, based upon competitive bids and

executed in terms of this statute. There is no provision of law which authorizes the commissioners to let contracts based on non-competitive or modified bids; and contracts which are so let are unenforceable. This being so, the plaintiffs did not forfeit their check by failing to give their bond, secured by mortgage on certain boats to be used by them in draining the lands of this district, for the faithful performance of this tentative contract.

The commissioners were not authorized to make material changes in the survey, plans, and specifications for this improvement, and then contract with plaintiffs for this improvement, based on said changes, without readvertising for bids, by reason of the provision in the specifications that the "engineer may at any time make any changes in the location, form, dimensions, grade, slopes, or excavation and embankments, the depths or widths of the ditches, or other work, and may make variations in quantities of work to be done, either before commencement of the work or during its progress, without thereby altering or invalidating any of the ratios of pay therein named, or this contract in any other respect, provided such changes shall not increase or reduce the total contract price more than 15%, or materially change the general character of the work, so as to make necessary the installation of different equipment." This provision refers to changes which can be made after contracts for these improvements have been made, and not to alterations in the work which can be made before such contracts are let upon competitive bids. Otherwise it would be in the power of the commissioners to effectively destroy all competitive bidding for the construction of these improvements. Under the above resolution of the commissioners, the plaintiffs' check was only to be held by the board until said mortgage bond was given, and this mortgage bond was only to be furnished upon the execution of a formal contract in more detail, executed after proper changes had been made by the engineer in the plans and specifications of the work. Until the terms and details of this formal contract had been agreed upon, and the formal contract executed, the plaintiffs were under no obligation to execute their mortgage bond. In the absence of the making of such contract, their check could not be forfeited. The check could not be cashed until the formal contract, with all its terms agreed to, had been executed and awarded to the plaintiffs.

3. As we have seen, "the successful bidder shall be required to enter into a contract with the board of drainage commissioners and to execute a bond for the faithful performance of such contract." Acts 1911, pp. 108, 120, 1 Park's Code, § 439(u). Under this law there must be a final, valid, and enforceable contract before the successful bidder is required to give this bond. If there is no such contract, no bond can be required. The parties executed an instrument which was not a final and binding contract. It expressly declares that it is only a tentative contract, that a contract in proper and legal form and more in detail is to be executed, and then only after changes have been made by the engineer, and a legal order has been obtained from the drainage court authorizing the same. This instrument amounts to nothing more than negotiations looking to a final and binding contract. To be final an agreement must comprise all the terms which the parties intend to introduce in it. Mackay v. Tide Water Oil Co., 158 N. Y. Supp. 667 (94 Misc. 694); Sherry v. Proal, 131 App. Div. 774 (116 N. Y. Supp. 234); 13 C. J. 289, § 100; Id. 303, § 124. Where it is evident from a written instrument, that the parties contemplated that it was incomplete, and that a binding agreement would be made subsequently, there is no agreement. Hawksworth v. Durant, 156 N. Y. Supp. 1026 (93 Misc. 149); Petze v. Morse Co., 125 App. Div. 267 (109 N. Y. Supp. 328), affirmed, 195 N. Y. 584 (89 N. E. 1110); Mayer v. McCreery, 119 N. Y. 434 (23 N. E. 1045). This tentative contract was a memorandum of some of the terms which were to go into the formal contract, which was not to be executed until the engineer had made certain changes in the specifications for the work, and an order had been obtained from the drainage court authorizing the contract; and such tentative agreement did not amount to a binding one. Until a contract in proper and legal form and more in detail was executed, after such changes had been made, and after such order had been obtained, there was no contract; and as there was no contract, no bond could be required of the plaintiffs for its performance. As no bond could be required of the plaintiffs, there could be no forfeiture of their check.

4. Under the above rulings a verdict was demanded in favor of the plaintiffs. This being so, it becomes unnecessary for us to consider the assignments of error on instructions given by the

court to the jury, and on the refusal of the trial judge to rule out certain evidence.

> *Judgment affirmed.   All the Justices concur.*