SOUTHEASTERN WASTE TREATMENT, INC. et al., Plaintiffs,

v.

CHEM–NUCLEAR SYSTEMS, INC., Defendant.

Civ. A. No. C79–69R.

United States District Court,
N. D. Georgia,
Rome Division.

Sept. 30, 1980.

Order On Reconsideration Dec. 23, 1980.

John T. Avrett, Kinney, Kemp, Pickell, Avrett & Sponcler, Dalton, Ga., for plaintiffs.

A. Felton Jenkins, Jr., and Chilton Davis Varner, King & Spalding, Atlanta, Ga., William E. Davidson, Smith, Shaw, Maddox, Davidson & Graham, Rome, Ga., for defendant.

### ORDER

HAROLD L. MURPHY, District Judge.

The plaintiff filed this complaint against the defendant seeking damages in five counts for breach of contract, violation of securities laws, and disclosure of confidential financial information. The action was removed to this Court from the Superior Court of Whitfield County, Georgia. Juris-

diction over this controversy is founded on 28 U.S.C. §§ 1332 and 1441.

### I STATEMENT OF FACTS

Few facts are in dispute in this case. The defendant is a Washington State Corporation involved in the waste disposal of chemicals and low level radioactive materials. The plaintiff corporation is a Dalton, Georgia waste disposal enterprise.

In mid-1978, the defendant corporation, through its then Manager of Chemical Treatment, contacted officers of the plaintiff corporation, and began negotiations for a possible acquisition. Financial data of the plaintiff corporation was released to the defendant under the express, and written assurance that this information would remain confidential. In addition to the discussions of the corporate acquisition, the parties also explored the possibility of the defendant corporation's employing Mr. James M. Henderson, the president of Southeastern Waste Treatment, Inc. (hereinafter "SWT").

In August, 1978, Chem-Nuclear Systems, Inc. (hereinafter "CNS"), presented an offer for the acquisition of SWT for $375,000 cash and 37,500 shares of CNS stock. SWT countered with an offer of $375,000 cash and 45,000 shares of CNS stock. A few days later, Mr. Wicks of CNS and Mr. Henderson of SWT agreed on a price of $375,000 and 40,000 shares of stock. It was agreed at that time that both parties would draft letters of intent. The letters were never fully executed, but both contained language that the agreement was contingent on the approval of the parties' respective Board of Directors, and on the execution of a final written agreement.

Subsequently, the parties' attorneys continued to negotiate about various unresolved aspects of the agreement. In late October, 1978, CNS learned that SWT's financial outlook was somewhat less optimistic than CNS had earlier believed.[1] CNS

---

1. The defendants filed a counterclaim alleging, in part, that the plaintiffs had misrepresented SWT's financial status and had defrauded CNS and its officers. These claims are not pertinent to defendant's motion for summary judgment since their argument is premised on the absence of a binding contract, not the voidability of that contract.

officials invited SWT officers to discuss further the financial posture of the SWT enterprise. Following another round of negotiations, CNS withdrew its prior offer and substituted an offer of $325,000 cash—a proposal which both parties agreed was less than the prior offer. SWT rejected this proposal.

Through January of 1979, further negotiations proceeded without success. CNS's final offer was for $650,000 cash contingent on future events.

Throughout the negotiation period, Mr. Henderson and SWT incurred certain expenses for which CNS agreed to reimburse them. This reimbursement was tendered, but refused in February of 1979.

## II PLAINTIFFS' CLAIMS

The complaint seeks damages in five counts: (1) breach of agreement to purchase; (2) violation of state and federal securities laws; (3) wrongful disclosure of financial information; (4) failure to reimburse expenses; and (5) breach of agreement to employ James M. Henderson.

## III DEFENDANT'S MOTION FOR, AND PLAINTIFFS' ARGUMENT AGAINST, SUMMARY JUDGMENT

### A. Breach of Agreement to Purchase

The defendant argues first that absent a writing to evidence the existence of an agreement to purchase, there can be no enforceable contract. Ga.Code § 109A–8–319 requires a memorialization of the agreement. Second, the defendant argues that there was no "meeting of the minds"—the parties expressly intended to execute a formal acquisition agreement, and until then there was no binding agreement. Third, the absence of agreement on various unresolved terms of the agreement rendered the contract incomplete and unenforceable.

The plaintiff argues that the statute of frauds provisions were satisfied by the Letter of Intent executed by an official of CNS. With respect to the failure to execute a formal acquisition agreement, the plaintiff contends that this provision of the Letter of Intent was abandoned; that this condition was merely ministerial; and that defendant's nonperformance of the condition cannot absolve it from performance. The unresolved items, argues the plaintiff, represented semantics problems between the lawyers, not an absence of agreement between the parties.

### B. Violation of State and Federal Securities Laws

The defendant argues that the plaintiffs have no standing since they are not "sellers" of stock as that term was defined in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Second, as numerous courts have held, the sale of 100% of a corporation's stock pursuant to the sale of that business does not constitute a sale of security. Third, the defendant contends that there was neither a misrepresentation by the defendant nor reliance by the plaintiff. Fourth, the plaintiff has not shown any damages.

The plaintiff responds that *Blue Chip* does not apply to these facts, and that the statutory definition of transactions covered encompasses this case. 15 U.S.C. § 78c(a). The plaintiff argues that "securities" were involved in this case, and the cases cited to the contrary by the defendant are inexplicable. With respect to the issue of reliance, the plaintiff relies principally on his complaint, and submits that the question is one for the jury. The plaintiff also suggests a calculus for ascertaining damages based on the difference between the contract price of the securities, and the book value on the date performance was due.

### C. Wrongful Disclosure of Financial Information

The defendant alleges that Mr. Henderson was given advance notice of the proposed disclosure of the imminent acquisition and no objection was made. The defendant also points to the absence of any evidence

of damage suffered as a result of this disclosure.

The plaintiff maintains that the disclosure constituted a breach of contract, a breach of a fiduciary relationship, and a wilful and deliberate tort. Attorney's fees, punitive damages, and litigation expenses are all recoverable in addition to any compensatory award made by a jury. The advance notice given to Mr. Henderson was irrelevant since he was not notified that financial information would be disclosed.

### D. Reimbursement for Expenses

The defendant asserts that it is willing to pay for these expenses. The plaintiff does not address this issue.

### E. Breach of Employment Contract

The defendant again relies on the statute of frauds in arguing that the employment contract is unenforceable. Furthermore, that contract was explicitly contingent on the consummation of the corporate acquisition. The condition precedent having not been satisfied, this agreement is unenforceable.

The plaintiff alleges that the statute of frauds presents no bar to recovery. Since the prospective employee could be discharged in less than a year, the statute of frauds does not apply. Furthermore, since there was a binding contact to purchase the corporation, all conditions precedent have been satisfied. The defendant's failure to perform cannot redound to Mr. Henderson's detriment.

The Court has reviewed the pleadings, the depositions, the affidavits and exhibits, and has studied the thorough and articulate briefs of counsel. The Court finds that there is no genuine issue as to any material fact on Counts one, and five, and summary judgment is accordingly granted. Genuine issues as to material facts are present with respect to Count three. On Count four, the Court feels that summary judgment is an inappropriate disposition. Summary judgment is granted in part, and denied in part on Count 2.

## IV DISCUSSION

### A. Breach of Agreement to Purchase

■ At the heart of this litigation is the issue of whether a legally enforceable agreement existed between the parties. There are two questions inherent in this issue. First, was there an agreement, and second was it legally enforceable. To prevail, the plaintiff must establish that both questions can be answered affirmatively.

Ga.Code § 109A–8–319 provides,

A contract for the sale of securities is not enforceable by way of action or defense unless

(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price.

It does not suffice to produce a document which specifies certain terms. The document must indicate that a contract has been made. However, it is not necessary that the writing itself be the contract. It need only *indicate the existence of a contract.* The Letter of Intent signed by the agent of CNS does not satisfy this requirement.

■ The opening clause states: "This Letter of Intent . . . evidences the mutual understanding and agreement in principle which has been reached between [SWT and CNS] regarding the proposed merger of SWT with a wholly owned subsidiary of CNS." What this mutual understanding and agreement consisted of, in part, was that the proposed merger was conditioned on the preparation, approval and execution by both parties of a definitive acquisition agreement, the approval of the parties' Boards of Directors, and the agreement on numerous other contract terms such as covenants, conditions, warranties, and hold harmless provisions. The agreement and mutual understanding of the parties was also that the document itself merely expressed the intentions of SWT and CNS, and that no obligations would arise prior to

the execution of a definitive acquisition agreement.

In plain and simple terms, the writing indicates that there was no existing contract between the parties. The Letter of Intent drafted by SWT contains identical language.

The purpose of the statute of frauds, originally, was more than just to alleviate problems of proof. In part it reflected an effort to remove certain controversies from the realm of the jury. In 1677 when the English Parliament first enacted the Statute of Frauds, juries were free to disregard evidence, and decide facts based on their own knowledge. The original statute stated that "no action shall be brought" which did not comply with the provisions of the Statute of Frauds. *See generally*, Murray on Contracts § 312 (2d Rev. ed. 1974). The Uniform Commercial Code does not proscribe bringing an action, but rather, directs that the Court will not enforce the contract.

Regardless of the original purpose of the Statute of Frauds, or the language which governs the consequences of failure to comply, the result is the same: Absent a writing to indicate that a contract has been made, the Court will not inquire further into the existence of any agreement.

 Counsel have focused much of their arguments on the existence of an agreement. Did the parties intend to be bound? Were the conditions precedent satisfied? Was there agreement on all material terms? The only signed document which exists states that the answer to these three questions is "no". It would frustrate the Statute of Frauds to search through the depositions in an effort to find contrary indications. If the existence of an agreement is not reflected in writing, it is unenforceable.

### B. Violation of Securities Laws

 The defendant argues that *Blue Chip* limited the private cause of action implied in Rule 10b–5 to *actual* purchasers and *actual* sellers. The defendant dismisses plaintiff's argument—that a buyer who has a contract to sell has standing—as erroneous in light of *Blue Chip*. The plaintiff's position is sound, but it does not apply to the facts of this case. In *Manor Drug Stores v. Blue Chip Stamps*, 492 F.2d 136 (9th Cir. 1973) the Court of Appeals compared a consent decree which required the appellee to offer its shares to particular non-shareholders, to a contract to purchase. Since the latter conferred standing on an aggrieved purchaser or seller, so should the former. The Supreme Court disagreed. But the Supreme Court did not hold that a contract to purchase was insufficient to confer standing. Rather, it held that a consent decree could not serve this purpose—in effect disagreeing with the Court of Appeals' comparison. The Supreme Court implicitly approved the earlier Ninth Circuit decision which held that a contract to purchase or sell was sufficient to confer standing. 421 U.S. at 735, 95 S.Ct. at 1925, *citing, Mount Clemens Industries v. Bell*, 464 F.2d 339 (9th Cir. 1972). Here, however, there was no contract. As already decided, even if there were an agreement it would be unenforceable because no writing indicates its existence. Absent an enforceable contract, the *Blue Chip* limitation precludes an action pursuant to the Securities Exchange Act of 1934.[2]

In addition to asserting federal securities law violations, the plaintiff's complaint indicates that state laws have also been violated. The plaintiff has not indicated on which law it premises this complaint (except that it can be found in Ga.Code Title

---

**2.** The defendant also relies on *Dueker v. Turner*, C79–677A (N.D.Ga. Dec. 28, 1979) in arguing that the transaction envisioned did not involve securities. There, the Court held that the sale of an entire corporation, with all of the shares of stock being transferred pursuant to that sale, did not constitute a sale of securities. The purchaser could not be an "investor" since he became the sole owner of the acquired corporation. In contrast to that case, however, the transaction here involved the exchange of all of SWT's shares in exchange for 40,000 shares of CNS stock. Thus, the shareholders of SWT would have become "investers" in CNS, and the transaction would have been covered by the Act. Because the negotiations between the parties did not constitute a sale, however, there is no need to decide this issue.

97), nor has either party briefed the issue. Accordingly, the Court will not address this specific issue. The plaintiff is requested to specify his cause of action with respect to the violations of state law within ten days. The defendant will be given twenty days from the filing of this statement to supplement its motion for summary judgment.

### C. The Employment Contract

■ The plaintiff contends that performance of the employment contract can occur within one year, and the statute of frauds, Ga.Code § 20–401(5) is consequently inapplicable. The defendant counters that if Mr. Henderson's employment was terminated within one year, then the contract, which called for his services for three years, would not have been performed. Consequently, the contract cannot be performed within one year. In *Grace v. Roan*, 145 Ga.App. 776, 245 S.E.2d 17 (1978) the Court held that a contract for employment for a period longer than one year is covered by the Statute of Frauds. Plaintiff's argument is well-suited to a case in which the contract for employment is for an indefinite period. *See e. g., Spindel v. National Homes Corp.*, 110 Ga.App. 12, 137 S.E.2d 724 (1964). Since the proposed contract of employment was not signed by either party, and cannot be performed within one year, its enforcement is barred by the Statute of Frauds. Ga.Code § 20–401(5).

### D. Release of Financial Information

■ The defendant does not dispute that certain financial information about SWT was released to the press. The defendant's written agreement to keep the information confidential is in the record. The fact that Mr. Henderson did not complain prior to the release is irrelevant if he was not advised that the financial data would be included in that release. His failure to complain when he saw the release does not absolve the defendant from liability for damages which resulted from this breach of contract. Clearly, the parties had not entered into an accord and satisfaction. Ga.Code § 20–1201. With respect to wheth-

er damages resulted from the release, the defendant relies solely on statements of Mr. Henderson as to his purpose in obtaining the agreement—preventing competitors from entering the market—and the fact that no competitors subsequently did enter the market as a result of the disclosure. However, any breach of contract can give rise to nominal damages. Ga.Code § 20–1409. Similarly, if the disclosure constituted a wilful tort, nominal damages can be awarded even if actual damages cannot be demonstrated. *Jeter v. Davis*, 33 Ga.App. 733, 127 S.E. 898 (1925). Summary judgment is therefore inappropriate.

### E. Reimbursement for Expenses

■ The defendant admits that it is indebted to the plaintiff for certain reimbursable expenses incurred by SWT and its employees. Summary judgment would be appropriately entered in favor of the plaintiff. However, the plaintiff has not moved for summary judgment. There appearing to be no genuine issue as to any material fact concerning this Count, the Court assumes that a trial will not be necessary on this question. Pending the outcome of the triable issues in this case, the defendant will make the appropriate payment to the plaintiff.

ACCORDINGLY, defendant's motion for summary judgment is GRANTED on Counts 1 and 5, is GRANTED IN PART and DENIED IN PART on Count 2, and is DENIED on Counts 3 and 4.

### ORDER ON RECONSIDERATION

Plaintiff filed this complaint seeking damages in five counts for breach of contract, violation of securities laws, and wrongful disclosure of confidential financial information. The action was removed to this Court from the Superior Court of Whitfield County, Georgia. Jurisdiction over this controversy is founded on 28 U.S.C. §§ 1332 and 1441.

In an order entered on September 30, 1980, the Court granted summary judgment to the defendant on the counts alleging breach of contract, violation of federal secu-

rities laws, and breach of agreement to employ James M. Henderson. The plaintiff has filed a motion for reconsideration of the order as it pertained to the federal securities law count.

A thorough review of the facts giving rise to this litigation prefaced this Court's September 30 order. The Court concluded in that order that to successfully maintain a claim for breach of contract, the plaintiff was required to demonstrate both the existence of an agreement *and* the existence of a written memorialization of that agreement. The only document which could satisfy the second prerequisite was the Letter of Intent, which this Court held did not satisfy the Statute of Frauds. Because the Letter of Intent expressly denied the existence of an agreement, it could not be a "writing signed by the party against whom enforcement is sought... sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price..." as required by Ga.Code § 109A–8–319. Since the Statute of Frauds was not satisfied, there was no need for the Court to sift exhaustively through the depositions, affidavits, and exhibits to determine if there was an agreement. *The Court did not hold that the parties had not reached an agreement.* Rather, the Court held that the agreement, if there were one, was not legally enforceable.[1]

The Court then proceeded to the count alleging a violation of the federal securities laws, Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j. Defendant argued in its initial brief that a *contract* to buy or sell securities did not pass the *Blue Chip* requirement that there be an *actual* sale: an actual purchaser and an actual seller is required, claimed the defendant, before an actionable securities fraud violation can exist. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723,

95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The Court disagreed. This Court interpreted *Blue Chip* to indicate that a contract to purchase would suffice to confer standing on an aggrieved party to that contract. *See, Mount Clemens Industries, Inc. v. Bell*, 464 F.2d 339, 345 (9th Cir. 1972), *cited approvingly by Blue Chip, supra*, at 735, 95 S.Ct. at 1925; *Ohashi v. Verit Industries*, 536 F.2d 849, 853 (9th Cir. 1976); *See generally, Herpich v. Wallace*, 430 F.2d 792 (5th Cir. 1970). Nevertheless, the Court held that the absence of a legally enforceable contract precluded the action for violation of the federal securities law. In other words, while *agreeing with the plaintiff* that standing could be conferred on an aggrieved party to a contract to purchase securities, the Court also held that the contract had to be legally enforceable. An oral contract to purchase securities would not confer standing on an aggrieved party to that contract.

Plaintiff has now filed a motion for reconsideration in which it directs the Court's attention to the case of *Desser v. Ashton*, 408 F.Supp. 1174 (S.D.N.Y.1975), *aff'd* 573 F.2d 1289 (2d Cir. 1977). There, the Court found that the parties may have entered into an oral agreement (unenforceable in New York), and held that this would be sufficient to overcome the *Blue Chip* obstacle that there be at least a contract for the purchase or sale of securities. An unenforceable oral agreement, the Court held, satisfies the jurisdictional requirement of the 1934 Securities Exchange Act.

For two reasons, this Court will not alter its initial order. First, the holding in *Desser* appears erroneous to this Court. Second, the Court has now examined all the evidence in the record, and concludes that there is no genuine issue of material fact concerning the existence of an agreement between the parties. There are not even slender whisps of evidence which hint that

---

1. In its response to plaintiff's motion for reconsideration the defendant claims that the Court decided that there was no oral or written contract. Defendant's Opposition to Plaintiff's Motion for Reconsideration, p. 3. The defendant quotes the Court's language found on page

six of the September 30 order: "The writing indicates that there was no existing contract between the parties." Even a cursory reading of the Court's order, however, reveals that the Court was focusing on the absence of a written document, not the absence of an agreement.

the parties had reached an agreement. The overwhelming and clear evidence is that the parties never intended to be bound by an agreement prior to the breakdown in negotiations.

## I.

The *Desser* opinion was premised on two unassailable propositions: (1) Rule 10b–5 is to be liberally construed; (2) there are no reported cases which expressly hold that an oral contract is insufficient to confer standing. While this Court will not dispute the truth of either of these propositions, the conclusion which the *Desser* Court drew is far from inevitable. A closer reading of *Blue Chip* reveals that the policy considerations which compelled the Supreme Court to require at least a contract between the prospective purchaser and seller also require that the contract be one which is enforceable.

The plaintiff in *Blue Chip* was an offeree of a stock offering made pursuant to an antitrust consent decree. The offeree and offeror had neither purchased nor sold any of the shares, but the offeree alleged that the offeror had prepared an overly pessimistic prospectus, constituting fraud under Rule 10b–5. The Court relied on a number of arguments to support its holding that the plaintiffs could not maintain a 10b–5 action. First, the Court reviewed the language of Section 10(b) which expressly states that the target of the Act is the commission of fraud "in connection with the purchase or sale" of securities. 421 U.S. at 733, 95 S.Ct. at 1924. Just as the Supreme Court held that an offeree has not been defrauded in connection with the sale of a security, it is clear that a party to an unenforceable contract has not been defrauded in connection with the sale of a security. There is simply no convincing argument which can be made to equate an unenforceable contract with a sale.

The Supreme Court also relied on the fact that one of the primary justifications advanced for implying a cause of action under § 10(b) was the provision of § 29(b) of the 1934 Act which rendered voidable any contract which was tainted with fraud. *See, e. g., Kardon v. National Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa.1946). Justice Rehnquist noted, "that justification is absent when there is no actual purchase or sale of securities, or a contract to purchase or sell, affected or tainted by a violation of § 10(b). 421 U.S. at 735, 95 S.Ct. at 1925. That argument has equal force with respect to an unenforceable contract since the deceived party cannot render void a contract which neither party could have enforced.

The most persuasive argument supporting Justice Rehnquist's opinion was the fear that any relaxation of the *Birnbaum* (actual purchaser/actual seller) requirement would inevitably result in the filing of lawsuits by an unmanageable number of plaintiffs. Any person who felt deceived by a financial report in the daily newspaper could file a complaint alleging that the deceptive report deterred him or encouraged him to purchase the stock. Inherent in this increased flux of potentially vexatious litigation would be insuperable problems of proof:

> Without the *Birnbaum* rule, an action under Rule 10b–5 will turn largely on which oral version of a series of occurrences the jury may decide to credit, and therefore no matter how improbable the allegations of the plaintiff, the case will be virtually impossible to dispose of prior to trial other than by settlement. . . . The *Birnbaum* rule, on the other hand, permits exclusion prior to trial of those plaintiffs who were not themselves purchasers or sellers of the stock in question. The fact of the purchase of stock and the fact of sale of stock are verifiable by documentation, and do not depend upon oral recollection, so that failure to qualify under the *Birnbaum* rule is a matter that can normally be established by the defendant either on a motion to dismiss or on a motion for summary judgment.

421 U.S. at 742, 95 S.Ct. at 1928. *See also, Manor Drug Stores v. Blue Chip Stamps,* 492 F.2d 136, 147 n.9 (9th Cir. 1973) (Hufstedler, J. dissenting; cited approvingly by Justice Rehnquist, 421 U.S. at 742, 95 S.Ct. at 1928); *Alley v. Miramon,* 614 F.2d 1372,

1386 (5th Cir. 1980) ("The [*Blue Chip*] Court noted that if a sale of securities were not required, liability would turn on hazy issues of fact, proof of which depended on uncorroborated oral testimony rather than objectively demonstrable facts such as documentary evidence."). It seems apparent to this Court that the explicit foundation of Justice Rehnquist's decision in *Blue Chip* compels a result contrary to the decision in *Desser*. The problems of proof inherent in discarding the *Birnbaum* rule which the Court feared in *Blue Chip* similarly would antagonize the fact-finder if an oral agreement would suffice to confer standing on an allegedly deceived party. In short, the Court's rationale for sustaining the *Birnbaum* rule echoes the fundamental rationale underlying the Statute of Frauds.

 In sum, this Court holds that the logic of *Blue Chip* inexorably leads to the conclusion that a person who alleges a violation of Rule 10b–5 must demonstrate that he is either an actual purchaser/seller or that he was a party to a legally enforceable contract to purchase or sell securities. The decision in *Desser* is not persuasive.

## II

Even if this Court were to adopt the rationale of *Desser*, the defendant would be entitled to summary judgment. In the September 30 order, this Court refused to decide whether the evidence indicated the existence of an agreement or not. Since there was no signed document, the existence of an agreement *vel non* was purely academic.

In light of the *Desser* decision, and acknowledging that there are no reported cases contrary to *Desser*, the Court has explored the depositions, affidavits, and exhibits to determine if summary judgment would be appropriate on the issue of the existence of an agreement—albeit unenforceable. After a review of all the evidence the Court concludes that summary judgment in favor of the defendant would be appropriate.

The Court's office in deciding a motion for summary judgment is not to resolve disputed factual issues, but rather, to decide if there are facts which are genuinely disputed. 10 Wright & Miller, Federal Practice and Procedure § 2712 (1973); *Southern Distributing Co. v. Southdown, Inc.*, 574 F.2d 824 (5th Cir. 1978). The facts in this litigation are essentially free from dispute.

 In May, 1978, Mr. Patrick Wicks contacted Mr. Jim Henderson about a possible acquisition of SWT by CNS. (Deposition of Wicks, p. 12; Deposition of Henderson, pp. 42–43). Wicks, who was at that time the manager of CNS's Chemical Division, and Henderson, President of SWT, agreed that negotiations should proceed. Wicks and Henderson met again in early June and continued to discuss the possibilities of an acquisition (Deposition of Wicks, p. 14; Deposition of Henderson, p. 45), and explored the operation of SWT's facilities. The next meeting occurred on June 26th in the State of Washington. (Wicks, p. 21; Henderson, p. 54). Wicks tentatively offered $550,000 for the purchase of SWT. Both parties acknowledge that this offer was tentative; Mr. Henderson recalls that the offer was more of an expression of "what [SWT] is worth." (Henderson, p. 60; Wicks, p. 24). Wicks next travelled to Dalton, Georgia on July 12, at which time a counter-proposal was submitted to him. (Wicks, p. 28). In addition to the acquisition discussions, Mr. Wicks and Mr. Henderson evaluated the prospects of Mr. Henderson's continued employment with the firm. (Henderson, p. 64–70).

The final meeting in this phase of the negotiations occurred on August 22. (Wicks, p. 32; Henderson, p. 71). Many of SWT's shareholders were present to discuss the imminent acquisition. Mr. Wicks offered $375,000 cash and 37,500 shares of CNS stock, "but that that was subject to approval by our Board of Directors and an audit." (Wicks, p. 34). Henderson recalls that the offer was made over the phone just prior to Wicks' arrival in Dalton. (Henderson, p. 72). After receiving that offer over the phone, Henderson invited Wicks to Dalton for the August 22 meeting, noting that the offer was "in the ballpark." (Henderson, p. 74).

At the August 22 meeting, SWT counter-proposed $375,000 cash and 45,000 shares of stock. Mr. Wicks brought this offer back to Washington. (Wicks, p. 34). Wicks called back within a few days and offered $375,000 cash and 40,000 shares of stock. (Wicks, p. 35; Henderson, p. 78). Henderson claims that he called back within a day and "I communicated to him that we had reached an agreement on that price, it was satisfactory, and we've essentially got a deal." (Henderson, p. 78). Shortly thereafter, CNS issued its Letter of Intent to SWT which was the subject of this Court's September 30 order. That document clearly and explicitly conditioned the agreement on approval by the Board of Directors of both firms and the preparation and execution of a definitive acquisition agreement. The Court has already held that this document did not evidence the existence of a binding agreement. It is clear that there was no binding agreement at this time.

According to Mr. Henderson's deposition, he never had any additional discussions about the acquisition with anybody from CNS. (Henderson, p. 93). Although a draft of the definitive acquisition agreement was prepared, only two of SWT's shareholders ever saw a copy. (Henderson, p. 95). Mr. Wicks' deposition also indicates that he and Mr. Henderson did not discuss the acquisition terms, although future operations was a topic of much discussion. (Wicks, pp. 40–45).

In late October, Wicks called Henderson and advised him to "hold off their attorneys working on this matter until we had [some newly discovered] problems resolved." (Wicks, p. 47; Henderson, p. 97). These problems—a competitor of SWT, and a not-so-rosy audit—were never resolved.

The critical time period is between August 22 and late October. In order to establish the existence of a contract, the plaintiff must demonstrate that something occurred to elevate the relationship of the parties from parties to a negotiation (as evidenced by the Letters of Intent) to parties to an oral agreement. There is no evidence that anything occurred during that time period which crystallized the agreement. At one point, the parties agreed to "forego the letter of intent and go directly to the definitive agreement." (Wicks, p. 60; Henderson affidavit ¶ 3). The definitive agreement was never reached; a draft was prepared but never executed.

As already noted, Henderson and Wicks did not discuss the terms of the acquisition after August 22. The lawyers, however, endeavored to iron out the mechanics of the agreement. The attorney for SWT only recalls two phone conversations with the attorney from CNS. (Joiner deposition, p. 58) An agreement and Plan of Reorganization was sent to Mr. Joiner by Mr. West on October 3. Mr. Joiner states, "We discussed back and forth the form of the agreement with John West, so I assume, at that particular point in time, it was not one that we were willing to execute as presented." (Joiner deposition, p. 60). The cover letter, prepared by Mr. West, states, "We confirm that CNSI agrees to reimburse SWT in the event no closing is held for the special audit costs of approximately $2,000 and the SBA loan commitment fee of approximately $1,500, since these amounts would not have been expended by SWT except for the possibility of the acquisition taking place. Except for these specific items, however, both parties are to bear their own expenses whether or not a closing is held." Exh. 3 to Joiner deposition). Clearly, CNS's attorney did not believe that the agreement had quickened.

Other evidence in the record reveals that discussions were continuing on the indemnity provisions (e. g., Joiner, pp. 80–82); the restriction on the sale of CNS shares (e. g., Joiner, p. 79); the escrowing of some number of CNS shares (e. g., Joiner, p. 80); *See generally*, Henderson, pp. 79–90.

The parties were certainly determined to enter into a contract, and complete the acquisition. An oral agreement, however, was never conclusively reached. Although the negotiations had matured well beyond the nascent stage, the parties were still negotiating when CNS withdrew its offer. Pending completion of the negotiations, the parties cannot be said to have entered an

oral contract upon which to predicate the securities fraud counts. *Cf. Malone Construction Company, Inc. v. Westbrook*, 127 Ga.App. 709, 194 S.E.2d 619 (1972) ("Unless an agreement is reached as to all terms and conditions and nothing is left to future negotiations, a contract to enter into a contract in the future is of no effect.")

### III

The Statute of Frauds, though seemingly harsh in effect on occasion, is a useful mechanism for encouraging people to formalize their business transactions. When a document is signed, the line between negotiation and contract is unmistakable.

This Court is certain that the rationale underlying the *Blue Chip* decision compels the holding that the purchaser and seller must have had, at a minimum, a signed document in compliance with the Statute of Frauds which evidences the existence of an enforceable contract, in order to maintain an action under Rule 10b–5.

The Court has also found that even absent that requirement, the defendant is entitled to summary judgment because there was no oral agreement upon which to ground the securities fraud allegation.

ACCORDINGLY, plaintiff's motion for reconsideration is DENIED.