863 F.2d 1550
 Fed. Sec. L. Rep. P 94,180, 7 UCC Rep.Serv.2d 1607
Ronald O. PELLETIER and Ronald O. Pelletier d/b/a ROP
Investments, Plaintiffs- Appellants,
v.
STUART-JAMES COMPANY, INC., et al., Defendants-Appellees et al.
 No. 87-8911.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 23, 1989.
 
 Herbert P. Schlanger, Atlanta, Ga., for plaintiffs-appellants.
 Christa Dagmar Taylor, Hart & Trinen, Donald T. Trinen, Denver, Colo., Rufus T. Dorsey, IV, Parker Hudson Rainer & Dobbs, Atlanta, Ga., for defendant-appellee.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before RONEY, Chief Judge, COX, Circuit Judge, and MORGAN, Senior Circuit Judge.
 MORGAN, Senior Circuit Judge:
 
 
 1
 This is a suit to recover damages for alleged securities fraud arising under Sections 10(b) and 20 of the Securities Exchange Act of 1934, as well as common law and the Georgia Securities Act of 1973. Appellant Ronald O. Pelletier d/b/a ROB Investments, is a customer of appellee, Stuart-James Company, Inc. ("Stuart-James"). Stuart-James is a registered broker-dealer with the Securities and Exchange Commission and has an office in Atlanta, Georgia. Appellee Coy Paschal, Jr., ("Paschal"), was an account executive of Stuart-James in Atlanta, Georgia. Appellee Art Rocker is an agent of Stuart-James and supervisor of Paschal in connection with the security transactions at issue in this action.
 
 
 2
 In March 1986, Paschal on behalf of Stuart-James allegedly entered into an agreement with appellant that Stuart-James would sell appellant 10,000 units of the initial public offering of Universal Medical Buildings, Inc. ("UMB") at a price of $2.50 per unit. Each unit of the public offering consisted of five common shares of UMB and two warrants which could be converted into UMB's stock. The units of the public offering constituted securities under the Exchange Act.
 
 
 3
 As a condition for selling appellant 10,000 units of the public offering, Paschal allegedly required appellant to buy stock of Denpac Corporation ("Denpac") and to cause another account to be opened with Stuart-James. As part of the alleged agreement with Stuart-James, appellant purchased 12,000 shares of Denpac common stock and 250 shares of Denpac preferred stock. On March 3, 1986, appellant delivered a check in the amount of $7,140 to Stuart-James as a payment for the Denpac stock. Appellant contends that he would not have purchased the shares of Denpac stock but for the fact that Stuart-James refused to sell units of the initial public offering to appellant unless appellant purchased shares of Denpac stock.
 
 
 4
 After appellant purchased the shares of Denpac stock, Paschal informed appellant that Stuart-James could deliver to appellant only 1,000 units of the public offering rather than the 10,000 units of UMB's public offering. On March 5, 1986, appellant mailed a check in the amount of $2,500 for 1,000 units of UMB's public offering. Thereafter, Paschal repeatedly sought permission from appellant to sell appellant's 1,000 units of the public offerings of UMB on the day of the public offering. Appellant refused to make a binding commitment to allow Paschal to sell the 1,000 units of the public offering.
 
 
 5
 On March 17, 1986, appellant telephoned Paschal to instruct him to sell appellant's units of the public offering of UMB. Paschal informed appellant that the appellees had not delivered the units of the public offering to appellant. Appellant contends that appellees refused to deliver the units of UMB's public offering because appellant refused to agree to sell the units in the aftermarket on the day of the public offering.
 
 
 6
 Appellant filed a six-count claim on April 15, 1986, based on appellees' fraud in connection with the purchase and sale of securities. Appellant's complaint includes claims for violations of Sections 10(b) and 20 of the Securities Exchange Act of 1934, common law intentional misrepresentation and fraud, breach of contract, fraud in the inception of the contract, and violations of the Georgia Securities Act of 1973.
 
 
 7
 On October 6, 1987, the trial in the action commenced in the United States District Court for the Northern District of Georgia. At the conclusion of appellant's evidence, the district court stated:[I] conclude that the plaintiff has failed to prove any elements that would entitle plaintiff to recover under any of the theories observed by the plaintiff.
 
 
 8
 And I also conclude that even if the plaintiff has established liability, the plaintiff has failed to establish any legally recoverable damages causally connected to any of the actions by any of the defendants. Therefore, the motion for directed verdict is granted.
 
 
 9
 The district court judge entered the order on October 14, 1987, granting the appellees' motion for directed verdict.
 
 
 10
 On appeal, appellant contends that there is sufficient evidence to present a jury question on the issues of appellees' fraud in connection with the sale of securities to appellant and appellant's damages. Appellant alleges that Paschal's promise in connection with a securities transaction to sell appellant 10,000 units of UMB's public offering although secretly intending not to sell the stock to appellant violates Section 10(b) of the Securities Exchange Act of 1934. Furthermore, appellant alleges that appellees' later contract to sell appellant 1,000 units of UMB although appellees had a secret plan, undisclosed to appellant, of delivering new issue only if the purchaser agreed to sell the stock on opening date of the new issue violates Section 10(b). Finally, appellant alleges that there is sufficient evidence of appellees' intentional misrepresentation and fraud to present a jury question.
 
 
 11
 In reviewing the district court's order granting appellees' motion for a directed verdict, the court must examine the whole record in a light most favorable to the party opposing the motion. Dempsey v. Auto Owners Ins. Co., 717 F.2d 556, 559 (11th Cir.1983). A directed verdict is appropriate only when there can be but one reasonable conclusion as to the verdict. Id.
 
 
 12
 Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance."[1] 15 U.S.C. Sec. 78j(b). Rule 10b-5, promulgated by the Securities and Exchange Commission under Section 10(b), prohibits any "artifice to defraud" or any act "which operates or would operate as a fraud or deceit upon any person, 'in connection with the purchase or sale of any security.' "[2] 17 C.F.R. Sec. 240.10b-5; see Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).
 
 
 13
 .............................................................
 
 
 14
 ...................
 
 
 15
 * * *
 
 
 16
 The United States Supreme Court, in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), held that a private damages action under Section 10(b) and Rule 10b-5 is confined to actual purchasers or sellers of securities.[3] Id. It is equally well established that a contract to purchase or sell securities constitutes the purchase or sale of securities within the meaning of the antifraud provisions of the securities laws. Id., 421 U.S. at 750-51, 95 S.Ct. at 1932-33, (citing 15 U.S.C. Sec. 78c(a)(13) and (14)).[4] Accordingly, a person who alleges a violation of Rule 10b-5 must demonstrate that he is an actual purchaser or seller, or that he was party to a legally enforceable contract to purchase or sell securities.[5]
 
 
 17
 In essence, one of appellant's theories of liability is based on a fraudulent refusal to perform a contract for the sale of 10,000 units. Appellees contend that the alleged agreement failed to comply with the Georgia "Statute of Frauds" for securities sales, O.C.G.A. Sec. 11-8-319(a), which provides:
 
 
 18
 A contract for the sale of securities is not enforceable by way of action or defense unless:
 
 
 19
 (a) There is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity or described securities at a defined or stated price.
 
 
 20
 In response, appellant argues that there was sufficient evidence to take the contract out of the statute of frauds and render it enforceable. Appellant contends that appellant's claim of entitlement to 10,000 units of UMB securities should not be subject to the statute of frauds because of the broker's "admission" as to the existence of "the agreement," as well as the brokerage firm's negotiation of a check sent by appellant, allegedly for the purchase of 1,000 units.
 
 
 21
 The court notes that in the complaint, and throughout the course of the trial, the appellant's theory was based on a fraudulent refusal to perform a contract for the sale of 10,000 units of UMB securities, not a later alleged contract for the sale of 1,000 units. The record shows no "admissions" were made with respect to the 10,000 unit contract, nor was any payment made or accepted with respect thereto. Furthermore, appellant has failed to offer any writing signed by Stuart-James or by any authorized agent indicating that a contract existed for the sale of the UMB securities. Consequently, appellant's theory based on a fraudulent refusal to perform a contract for the sale of 10,000 units of UMB securities must fail because the alleged agreement is unenforceable as a matter of law.[6] Where a contract is unenforceable, an action for damages cannot be maintained on the ground of fraud in refusing to perform the contract, even though the promisor at the time of making the oral contract may have had no intention of performing it. See Canell v. Arcola Housing Corp., 65 So.2d 849, 851 (Fla.1953); see also Caplan v. Roberts, 506 F.2d 1039, 1041 (9th Cir.1974) (interpreting California law).
 
 
 22
 Section 10(b) and Rule 10b-5 proscribe fraudulent conduct "in connection with the purchase or sale of any security." 15 U.S.C. Sec. 78j; 17 C.F.R. Sec. 240.10b-5. Appellant must show that the fraudulent conduct "touches" the purchase or sale of securities.[7] See Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 12-13, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). Because there exists no enforceable contract for the sale of UMB securities, appellant is precluded from asserting a 10b-5 fraud claim "in connection with" the attempted purchase of UMB securities. Appellant's purchase of the Denpac stock, however, serves as the predicate for an action under the securities law. See Smallwood v. Pearl Brewing Co., 489 F.2d 579, 595 (5th Cir.), cert. denied, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974).
 
 
 23
 Appellant argues as a second theory of liability that appellees fraudulently induced appellant to purchase Denpac stock from Stuart-James by means of appellees' promise to sell 10,000 units of UMB to appellant at a later date. In Messer v. E.F. Hutton & Co., 833 F.2d 909 (11th Cir.1987), this court recognized that a fraudulent promise to perform future acts--though not sufficient to support a common law fraud action--can be the basis of a claim of securities fraud under Section 10(b) if the promise is part of the consideration for the sale of securities.[8] Id. at 914. Under this theory, the fraudulent promise to sell 10,000 units of UMB in the future in order to cause the Denpac purchase constitutes a "misleading and deceptive practice" in the "special Rule 10b-5 sense of the word [fraud]," Id. (quoting Woodward v. Metro Bank of Dallas, 522 F.2d 84, 93 (5th Cir.1975). See Luce v. Edelstein, 802 F.2d 49 (2d Cir.1986) ("Plausible allegations that defendants made specific promises to induce a securities transaction while secretly intending not to carry them out or knowing they could not be carried out, and that they were not carried out are sufficient to state a claim for relief under Section 10(b)."). See also Pross v. Katz, 784 F.2d 455 (2d Cir.1986); McGrath v. Zenith Radio Corp., 651 F.2d 458, 466 (7th Cir.), cert. denied, 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981).
 
 
 24
 The law is clear that an action for fraud may not be predicated on inducing a party to enter into an unenforceable contract. Gregg v. U.S. Indus., 715 F.2d 1522 (11th Cir.1983). The court recognizes, however, that an allegation that a securities transaction was fraudulently induced by a promise, even an unenforceable one, to perform a future act can be actionable under Section 10(b) if the promise is part of the consideration of the sale.[9] The dispute in this case focuses upon whether appellant sustained any legally recoverable damages from the appellees' alleged violations of Section 10(b) of the Securities Exchange Act of 1934.
 
 
 25
 Appellant seeks to recover the substantial profits that could have accrued to him as the owner of 10,000 units of UMB. Appellant argues that, at the very least, damages would be equal to the difference between the public offering of 10,000 units of UMB and the high market price of the units on the day of the public offering. Accordingly, appellant asserts an entitlement to damages exceeding $125,000.[10]
 
 
 26
 Although neither Section 10(b) of the Act nor Rule 10b-5 contains explicit provisions for determining damages, courts have applied the damages standard of Section 28 of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78bb(a), to Rule 10b-5 claims. Feldman v. Pioneer Petroleum, Inc., 813 F.2d 296, 301 (10th Cir.1987). Section 28(a) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78bb(a), "limits recovery in any private damages action brought under the 1934 Act to 'actual damages.' "[11] Blue Chip Stamps, 421 U.S. at 734, 95 S.Ct. at 1925. See Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). In securities fraud cases, therefore, damages are determined in accordance with the extent to which a plaintiff is actually damaged as a result of the defendant's fraudulent conduct. Harris v. Union Elec. Co., 787 F.2d 355 (8th Cir.1986). "Actual damages" has been interpreted to mean some form of economic loss and does not include punitive damages.[12] Jones v. Miles, 656 F.2d 103, 107 n. 8 (5th Cir. Unit B Aug. 1981). Generally, the appropriate measure of actual damages in a Rule 10b-5 case is out-of-pocket loss.[13] Woods v. Barrett Bank of Ft. Lauderdale, 765 F.2d 1004 (11th Cir.1985); Alna Capital Ass'n v. Wagner, 758 F.2d 562 (11th Cir.1985); Hackbart v. Holmes, 675 F.2d 1114 (10th Cir.1983). Under Section 28 of the 1934 Act, according to the Supreme Court, the "correct measure of damages ... is the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct."[14] Randall v. Loftsgaarden, 478 U.S. 647, 661, 106 S.Ct. 3143, 3152, 92 L.Ed.2d 525 (1986) (quoting Affiliated Ute Citizens v. United States, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972)).
 
 
 27
 The strictly compensatory nature of damages awardable in private securities fraud action requires that the defrauded party show more than a mere loss of a noncontractual opportunity to buy or sell securities.[15] The measure of damages in a Rule 10b-5 case is limited to actual pecuniary loss suffered by the defrauded party, and does not include any speculative loss of profits. See Wolf v. Frank, 477 F.2d 467, 478 (5th Cir.), cert. denied, 414 U.S. 975, 94 S.Ct. 287, 38 L.Ed.2d 218 (1973); see also Harris v. American Inv. Co., 523 F.2d 220 (8th Cir.1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976).
 
 
 28
 A plaintiff has the burden of proving every element of his Rule 10b-5 anti-fraud action, including damages. Upon careful examination of the record, we agree with the district court's finding that appellant has simply failed to prove any legally recoverable damages, i.e., actual pecuniary loss, resulting from the alleged fraudulently induced Denpac stock purchase.[16] The failure to show actual damages is a fatal defect in an anti-fraud action pursuant to Rule 10b-5.[17] Feldman, 813 F.2d at 302; Shapiro v. Midwest Rubber Reclaiming Co., 626 F.2d 63, 69-70 (8th Cir.1980), cert. denied, 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981).
 
 
 29
 Appellant correctly notes that a court may award "benefit of the bargain" damages[18] under Rule 10b-5 when the circumstances require it. John R. Lewis, Inc. v. Newman, 446 F.2d 800, 805 (5th Cir.1971). While out-of-pocket loss is generally the proper measure of damages, this measure is "not a talisman." Garnatz v. Stifel, Nicolaus & Co., 559 F.2d 1357, 1360 (8th Cir.1977), cert. denied, 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978). The function of the court "is to fashion the remedy best suited to the harm." Id. Accordingly, a rescissional remedy may be available to a defrauded plaintiff under Rule 10b-5.[19] Id.; Huddleston v. Herman & MacLean, 640 F.2d 534, 539 (5th Cir. Unit A, Mar. 1981).
 
 
 30
 In order to be entitled to "benefit of the bargain" damages, however, there must in fact be a "bargain" or contract. Specifically, there must be an enforceable contract for the "purchase or sale" of securities in order to support jurisdiction under Rule 10b-5, 17 C.F.R. 240.10b-5. Blue Chip Stamps, 421 U.S. 723, 95 S.Ct. 1917; see Reid v. Hughes, 578 F.2d 634 (5th Cir.1978). The damages that appellant seeks to recover in this case arise from the alleged fraudulent failure of appellees to perform an unenforceable contract. Appellant does not have standing to seek damages resulting from the attempted purchase of UMB securities because appellant was neither a purchaser nor seller in connection with that transaction. See Wolf, 477 F.2d at 478. The jurisdictional peg for liability under Rule 10b-5 is available only for damages resulting from the alleged fraudulently induced Denpac stock purchase. See Herpich v. Wallace, 430 F.2d 792, 806 (5th Cir.1970) ("We are of the opinion that only purchasers and sellers of ... securities in connection with which fraud has allegedly been committed [ ] can show injury of the type the rule is meant to prevent.")
 
 
 31
 Finally, appellant argues that there was sufficient evidence of appellees' intentional misrepresentation and fraud to present a jury question under Georgia law. Under Georgia law, fraud can be based on a misrepresentation of future events if the person making the misrepresentation at that time knew that the future event would not take place. Hines v. Good Housekeeping Shop, 161 Ga.App. 318, 291 S.E.2d 238 (1982) (citing McCravy v. McCravy, 244 Ga. 336, 337, 260 S.E.2d 52 (1979)). Moreover, appellant contends that appellees' fraud would have justified punitive damages pursuant to appellant's claims under Georgia law. Gower v. Cohn, 643 F.2d 1146, 1161 (5th Cir.1981) (citing Diana v. Monroe, 132 Ga.App. 669, 672, 209 S.E.2d 70 (1974)).
 
 
 32
 "Fraud, accompanied by damage to the party defrauded, always gives a right of action to the injured party." O.C.G.A. 51-6-1. By the express language of the statute, only fraud which results in damage is actionable. See Motors Ins. Corp. v. Morgan, 117 Ga.App. 654, 161 S.E.2d 382 (1968) ("Fraud without damage, or damage without fraud, gives no cause of action, but when these two concur an action lies.") The out-of-pocket measure of damages is also the usual rule of recovery in the common law action for deceit from which Rule 10b-5 derives. Huddleston, 640 F.2d at 555. See Restatement (Second) of Torts Sec. 549. As previously discussed, appellant has failed to show any actual damages resulting from the alleged fraud. Furthermore, punitive damages and attorney's fees are not recoverable when there is no entitlement to actual damages.[20] Wade v. Culpepper, 158 Ga.App. 303, 305, 279 S.E.2d 748 (1981) (citing Anthony v. Anthony, 143 Ga.App. 691, 240 S.E.2d 167 (1977).
 
 
 33
 We conclude that the district court properly directed a verdict against appellant because there exists no enforceable contract for the sale of 10,000 units of UMB securities and appellant has not suffered any legally recoverable damages resulting from the alleged fraudulent conduct proscribed by Section 10(b). Accordingly, for the reasons given above, the decision of the district court is AFFIRMED.
 
 
 
 [1]
 Section 10(b) provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national security exchange--
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. 15 U.S.C. Sec. 78j(b).
 Appellant also relies upon Section 20 of the Exchange Act for control person liability with regard to appellees Stuart-James and Rocker.
 
 
 [2]
 Rule 10b-5 provides:
 It shall be unlawful ...
 (a) To employ any device, scheme or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. Sec. 240.10b-5.
 
 
 [3]
 The Court was actually considering the widely followed "Birnbaum rule" which had its roots in Birnbaum v. Newport Steel Corp., 193 F.2d 461, 464 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), decided twenty-three years earlier. That rule, as the Supreme Court viewed it, precluded non-purchasers and non-sellers from suing for money damages under Section 10(b) and Rule 10b-5. Birnbaum was actually an action in equity; however, most courts that applied it did so in the context of damages actions. See, e.g., Haberman v. Murchison, 468 F.2d 1305 (2d Cir.1972)
 
 
 [4]
 As Judge Murphy recognized in Southeastern Waste Treatment, Inc. v. Chem-Nuclear Systems, Inc., 506 F.Supp. 944 (N.D.Ga.1980), "[a]bsent an enforceable contract, the Blue Chip limitation precludes an action pursuant to the Securities Exchange Act of 1934." Id. at 949
 
 
 [5]
 Although the Securities and Exchange Commission sought to have Section 10(b) (15 U.S.C. Sec. 78j(b)), expanded by Congress to include "attempted" purchases or sales, such proved unsuccessful on two separate occasions. Blue Chip Stamps, 421 U.S. at 732, 95 S.Ct. at 1923. In Blue Chip Stamps, Justice Rehnquist explained:
 The Birnbaum rule undoubtedly excludes plaintiffs who have in fact been damaged by violations of Rule 10b-5, and to that extent it is undesirable. But it also separates in a readily demonstrable manner the group of plaintiffs who actually purchased or actually sold, and whose version of the facts is therefore more likely to be believed by the trier of fact, from the vastly larger world of potential plaintiffs who might successfully allege a claim but could seldom succeed in proving it. And this fact is one of its advantages. 421 U.S. at 742-43, 95 S.Ct. at 1929.
 
 
 [6]
 Any attempt to characterize the Denpac sale as "part performance" of the alleged UMB sale agreement also fails. Generally, the conduct which is alleged to constitute "part performance" under a sale agreement must be specifically referable to, and tend to clearly validate, the existence of a contract. See Throndson v. C.I.R., 457 F.2d 1022 (9th Cir.1972). The "part performance" which will take an oral contract out of the statute of frauds is part performance of the contract, and the doing of an independent thing, even though the act would not have been done but for the contract, is not sufficient. Smith v. Davidson, 198 Ga. 231, 31 S.E.2d 477 (1944); Ellis v. Savannah Bank & Trust Co. of Savannah, 237 Ga. 612, 229 S.E.2d 417 (1976). Moreover, the statute of frauds specifically provides that the part performance must consist of payment, and that such has the effect of validation only to the extent of the amount of payment made. O.C.G.A. Sec. 11-8-319(b)
 
 
 [7]
 The fraudulent scheme or device, however, need not relate to the "investment value" of the security in order to establish a 10(b) cause of action. A.T. Brod & Co. v. Perlow, 375 F.2d 393, 396 (2nd Cir.1967)
 
 
 [8]
 Messer involved a suit by an investor to recover damages resulting from unauthorized trades by the investor's brokerage firm. The investor contended that the brokerage firm's promise to him when he opened his account that it would execute transactions in his account only upon his direction was a material misrepresentation actionable under Section 10(b) and Rule 10b-5. The court found that the investor failed to make a case under Section 10(b) with respect to the unauthorized trades absent showing that the broker acted with the requisite scienter, and concluded that the investor's sole surviving claim was for breach of contract. 833 F.2d 909
 
 
 [9]
 The Restatement (Second) of Contracts Sec. 80 (1981) states:
 The fact that a rule of law renders a promise voidable or unenforceable does not prevent it from being consideration.
 
 
 [10]
 During the first day of secondary trading, March 17, 1986, the value of UMB units rose from $2.50 to $15.00, and thus a $25,000 investment would have increased in value to $150,000 in less than 24 hours
 
 
 [11]
 15 U.S.C. Sec. 78bb(a) states in part:
 The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.
 
 
 [12]
 Punitive damages may be awarded on pendent state law claims even though not permitted in a 10(b) claim. Grogan v. Garner, 806 F.2d 829 (8th Cir.1986)
 
 
 [13]
 In cases arising under Section 10(b) and Rule 10b-5, the federal courts employ an out-of-pocket rule of damage borrowed from the tort action of deceit. Harris v. American Inv. Co., 523 F.2d 220 (8th Cir.1975), cert. denied, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976)
 
 
 [14]
 Restatement (Second) of Torts Sec. 549 (1977) measures damages for fraudulent misrepresentation as
 (1)(a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
 (b) Pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.
 
 
 [15]
 In Blue Chip Stamps, the Supreme Court looked at the policy considerations behind Section 10(b) in determining that Section 10(b) did not accord putative buyers a right of action for damages. 421 U.S. at 737, 95 S.Ct. at 1926. The court's overriding concern was that an expanded class of plaintiffs under Rule 10b-5 could result in extensive opportunities for "vexatious" litigation of highly speculative claims. Id. at 740, 95 S.Ct. at 1927. Justice Rehnquist, writing for the majority, noted:
 While the damages suffered by purchasers and sellers pursuing a Sec. 10(b) cause of action may on occasion be difficult to ascertain, in the main such purchasers and sellers at least seek to base recovery on a demonstrable number of shares traded. In contrast, a putative plaintiff, who neither purchases nor sells securities but sues instead for intangible economic injury such as a loss of a non-contractual opportunity to buy or sell, is more likely to be seeking a largely conjectural and speculative recovery in which the number of shares involved will depend on the plaintiff's subjective hypothesis.
 Id. at 734-35, 95 S.Ct. at 1925 (citations omitted). These policy considerations would not require the dismissal of a suit for injunctive relief, however, since a plaintiff seeking an injunction is quite often successful precisely because he cannot calculate the damages he suffers. Liberty Nat. Ins. Holding Co. v. Charter Co., 734 F.2d 545 (11th Cir.1984).
 
 
 [16]
 As appellant conceded at trial: "We didn't make out a specific claim for loss on Denpac. That's not the theory of our case." Appellant also argues that appellees' promise to sell appellant 1,000 units of UMB although appellees had a secret policy, undisclosed to appellant, of delivering new issue only if the purchaser agreed to sell the stock on opening day of the new issue violates Section 10(b). Appellees' actions, according to appellant, constituted fraud as appellees were not legally entitled to impose this condition after the sale of the units of UMB. A.T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir.1967). Assuming for the sake of argument that appellees' conduct constituted fraud actionable under Section 10(b), appellant has failed to establish any legally recoverable damages for the same reasons given above
 
 
 [17]
 Restatement (Second) of Torts Sec. 549 comment (1)(a) notes that under the out-of-pocket rule:
 [T]he recipient of the fraudulent misrepresentation is entitled to recover from its maker in all cases the actual out-of-pocket loss which, because of its falsity, he sustains through his action or inaction in reliance on it. If, notwithstanding the falsity of the representation, the thing that the plaintiff acquires through the fraudulent transaction is of equal or greater value than the price paid and he has suffered no harm through using it in reliance upon its being as represented, he has suffered no loss and can recover nothing under the [out-of-pocket] rule ...
 
 
 [18]
 Restatement (Second) of Torts Sec. 549 follows a compromise position in measuring damages for fraudulent misrepresentation. This approach gives the plaintiff the option of either the out-of-pocket or the benefit-of-the-bargain rule in any case in which the latter measure can be established by proof in accordance with the usual rules of certainty in damages. Id., comment on subsection (2)h. Subsection (2) of Section 549 states:
 (2) The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.
 
 
 [19]
 Rescission is the avoidance or undoing of the transaction. Its purpose is to return the defrauded purchaser to the status quo ante; it contemplates the return of the injured party to the position he occupied before he was wrongfully induced to enter the transaction. Huddleston, 640 F.2d at 554. The Supreme Court in Randall v. Loftsgaarden, 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986), specifically declined to decide the "issue whether and under what circumstances rescission or a rescissory measure of damages is available" in a Rule 10b-5 action. Id
 
 
 [20]
 Punitive damages might be awarded in connection with a state securities violation also, but only if in accord with the requirements of O.C.G.A. 51-6-1, the codification and source of the Georgia common law fraud cause of action. Jones v. Miles, 656 F.2d 103, 108 n. 8 (5th Cir. Unit B Aug. 1981)