**ANDERSON CHEMICAL CO., INC., et al., Plaintiffs,**

**v.**

**PORTALS WATER TREATMENT, INC., et al., Defendants.**

**Civ. A. No. 88–78–3–MAC (WDO).**

United States District Court, M.D. Georgia, Macon Division.

June 28, 1991.

---

W. Lyman Dillon, Mary A. Prebula, Hansell & Post, Atlanta, Ga., for plaintiffs.

Carl A. Neumann, Keck, Mahin & Cate, Oakbrook Terrace, Ill., for Anderson Equipment Co. and David M.A. Knowles.

John C. Filosa, Michael K. Murtaugh, Richard M. Franklin, Baker & McKenzie, Chicago, Ill., Benjamin M. Garland, Hall, Bloch, Garland & Meyer, Macon, Ga., for defendants.

## ORDER

OWENS, Chief Judge.

Plaintiffs are Anderson Chemical Company, Inc., its subsidiary corporations and its stockholders ("Anderson Chemical"). Defendants are Portals Holdings PLC of the United Kingdom and its United States subsidiaries, Portals Water Treatment, Inc. and Wright Chemical Company ("Portals").

Anderson Chemical, its subsidiaries and stockholders, are citizens of different states from defendants who are subjects of

a foreign state and citizens of other different states. The controversy exceeds the sum of $50,000, exclusive of interest and costs. The court, therefore, has jurisdiction under 28 U.S.C. § 1332.

By their complaint and motion for summary judgment plaintiffs contend that the defendants, on November 9, 1987, in writing, contracted to buy plaintiff corporation and its subsidiaries from plaintiff stockholders for some $13,400,000 and then defaulted, damaging plaintiffs in an amount of more than $4,000,000. Plaintiffs contend there is no genuine issue of material fact and that they are entitled to a judgment as a matter of law on each of their thirteen alleged causes of action.

Defendants assert by their responsive pleadings and cross motion for summary judgment that the November 9, 1987, writing is not an enforceable contract for defendants to purchase Anderson Chemical Company, Inc. and its subsidiaries from plaintiff stockholders; that there is no genuine issue of material fact; and that defendants, on each of plaintiffs thirteen asserted causes of action, are entitled to judgment as a matter of law.

Rule 56(c) of the Federal Rules of Civil Procedure allows for the granting of summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The moving party bears the initial burden of showing, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 607 (11th Cir., April 19, 1991). "Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id.*

### The Material Undisputed Facts

Portals Holdings PLC is an international enterprise headquartered in the United Kingdom. It and its many world-wide subsidiaries at the time in question had annual gross sales of some $350,000,000, about 60% of which came from its water treatment division. Portals Water Treatment, Inc. and Wright Chemical Corporation, both of Schiller Park, Illinois, are two of Portals' United States subsidiaries. As a result of Wright Chemical Company's disappointing performance over several years, Portals Holdings PLC, in the fall of 1986, authorized Portals Water Treatment, Inc. and Wright Chemical Company, Inc. management to begin searching for a United States company to acquire for the purpose of possibly expanding Wright Chemical Company, Inc. and making it into a profitable enterprise. Devoto and Company of Atlanta, Georgia, a company representing United Kingdom businesses desiring to acquire United States businesses, was hired to find suitable prospects. Devoto contacted Richard K. "Jet" Anderson, chief executive officer and majority stockholder of Anderson Chemical, and interested him in talking with Portals' representatives about the possibility of Portals acquiring Anderson Chemical. With a written understanding of confidentiality, discussion began between Portals' United States representatives and Anderson Chemical on July 6, 1987. "Jet" Anderson, assisted by his attorney and his certified public accountant, was the main negotiator for Anderson Chemical. John S. Roberts and David Knowles, both employees of Portals' United States subsidiaries, were the main negotiators for Portals.

After many meetings, much conversation, extensive negotiations, disclosure of confidential operating and financial data, visits to each other's plants and offices, and exchange of proposed written agreements the parties signed the first and only writing that both plaintiffs and defendants agreed to on November 9, 1987, in Chicago, Illinois. Plaintiffs contend that the November 9, 1987, writing is a contract, while defendants contend it is a non-binding letter of intent. The writing reads as follows:

EXHIBIT D

## Portals Water Treatment

Portals Water Treatment, Inc.
4328 N. United Parkway
Schiller Park, Illinois 60176
Telephone: 312–678–4806
Telex: 206682

November 9, 1987

Mr. Richard K. Anderson
Anderson Chemical Company, Inc.
Waterville Road
Macon, Georgia 31206

Anderson Chemical Company, Inc.
Waterville Road
Macon, Georgia 31206

Mr. W. Ray Benton
Anderson Chemical Company of
of Tennessee, Inc.
P.O. Box 8151
Jackson, Mississippi 39204

Anderson Chemical Company of
Tennessee, Inc.
Box 13244 Riverside Station
Memphis, Tennessee 38113

Mr. Thomas B. Parker
Anderson Chemical Company, Inc.
Waterville Road
Macon, Georgia 31206

Anderson Chemical Company of
Texas, Inc.
Box 47792 Brook Hollow Station
Dallas, Texas 75247

Estate of James W. Anderson
1320 Briarcliff Road
Macon, Georgia 31211
Attention: Richard K.
Anderson, Executor

J.W. Anderson Holding Co.
Box 4507
Macon, Georgia 31213

Gentlemen:

1. We wish to confirm our discussion with you or your representatives regarding the proposed purchase by Portals Water Treatment, Inc., a Delaware corporation ("Portals"), of Anderson Chemical Company, Inc., a Georgia corporation ("Anderson–Ga."), Anderson Chemical Company of Texas, a Texas corporation ("Anderson–Tex."), and Anderson Chemical Company of Tennessee, a Tennessee corporation ("Anderson–Tenn.") (individually a "Company" and collectively the "Companies"). The terms of the proposed acquisition are summarized as follows:

(a) The aggregate purchase price will be $13,400,000, subject to adjustment as provided herein (the "Purchase Price"). The Purchase Price will be allocated among the Companies in a manner consistent with the calculation of the purchase price in accordance with allocation percentages (the "Allocation Percentages") to be agreed upon by the parties.

(b) The price per share paid to stockholders for their shares in any Company will equal the product of (i) the Allocation Percentage for such Company, (ii) times the Purchase Price, (iii) times a fraction, the numerator of which is the number of shares owned by such person in such Company and the denominator of which is the aggregate number of issued and outstanding shares of such Company (the "Price Formula").

(c) Portals will purchase from Mr. Richard K. Anderson and the Estate of James W. Anderson (the "JWAH Sellers") all of the issued and outstanding capital stock of J.W. Anderson Holding Co., a Georgia corporation ("JWAH"), which is the record and beneficial owner of the capital stock of the Companies as follows:

| Company | Shares of Common Stock | Approximate Percentage of Outstanding Stock |
|---|---|---|
| Anderson–Ga. | 15,736 | 52.7% |
| Anderson–Tenn. | 6,518 | 53.3% |
| Anderson–Tex. | 6,726 | 40.3% |

The JWAH Sellers will be paid a portion of the Purchase Price equal to the aggregate amount to which JWAH would be entitled under the Price Formula for the capital stock of the Companies owned by it and such amount will be allocated between the JWAH Sellers according to their respective ownership interests in JWAH.

However, neither the immediately preceding sentence nor any other provision of this Letter of Intent will be construed to mean that JWAH is selling any of the capital stock of the Companies. Instead, Portals acknowledges that the express intent of the parties is to structure this transaction so that Portals will be purchasing stock of JWAH from the JWAH sellers, and will not be purchasing from JWAH stock of the Companies owned by JWAH.

(d) Portals will then acquire the capital stock of the Companies, to the extent that such stock is not owned by JWAH, from all other stockholders of the Companies through a statutory merger of the Companies with and into JWAH (the "Merger") which will be the surviving corporation ("New Anderson"). The price per share paid to the remaining stockholders in the Companies pursuant to the Merger will be calculated according to the Price Formula.

(e) The acquisition of the shares of capital stock of JWAH referred to in (c) above (the "Stock Purchase") will be closed immediately prior to the closing of the Merger and after the respective meetings of the stockholders of the Companies and JWAH called for the purpose of approving the Merger. Messrs. Benton and Parker, JWAH and the JWAH Sellers will commit to vote for the Merger at such meetings.

(f) The Purchase Price will be payable in cash as follows:

(i) an aggregate of $10,200,000 at the Merger and Stock Purchase closings, and

(ii) an aggregate of $3,200,000 payable in two installments of $1,900,000 and $1,300,000, respectively, within ninety (90) days after the last business day of the months in which the first and second anniversary dates of the Merger closing occur (the "Contingent Payments") together with simple interest of 9.23% per annum on the final principal amount of the second installment (up to $1,300,000) for the twelve-month period from the first anniversary date to the second anniversary date up to a maximum of $120,000.

The JWAH Sellers and the stockholders of the Companies receiving cash in the Merger will each receive their pro-rata share of the payments referred to in (i) and (ii) above according to the Pricing Formula.

(g) The purchase price of $13,400,000 is based upon historical performance of the Companies with certain add-backs and our expectation that New Anderson will earn pretax operating profits with such add-backs of at least $1,466,000 in each of the two twelve-month periods following the closing. Based upon such historical performance and expectation and giving certain leeway for normal disruptions, etc., in the event that the pretax operating profits of New Anderson for either such twelve-month period are less than $1,000,000, the applicable Contingent Payment will be reduced by the amount by which $1,466,000 exceeds the pretax operating profits of New Anderson for such twelve-month period; provided, however, that the second installment shall be increased such that the aggregate contingent payments shall equal $3,200,000 if New Anderson earns an aggregate of $2,000,000 in pretax operating

profits (after offsetting any losses) during the two twelve-month periods; and further provided, that in the event that New Anderson incurs a pretax operating loss in any such twelve-month period, no Contingent Payment shall be made for such twelve-month period, except as set forth in the immediately preceding proviso.

(h) Pretax operating profit will be computed in U.S. dollars using U.S. generally accepted accounting principles consistently applied, will be on the accrual basis, and will be prepared by New Anderson based on its monthly internal financial statements for each period which will be reviewed and reported on by Peat Marwick Main & Co. or such other independent certified public accounting firm acceptable to Portals. The report of such accounting firm concerning the amount of pretax operating profit for each period will be binding upon the parties. To the extent feasible, Portals will consider using Clifton, Lipford & Taylor, P.C. as certified public accountants for New Anderson for the first two years but Peat Marwick Main & Co. or such other independent certified public accounting firm acceptable to Portals will be responsible for final audit reports for New Anderson.

(i) Portals may, after further review and analysis, propose alternative acquisition structures, such as the use of a Delaware acquisition corporation to act as the surviving corporation in the statutory merger, on the terms set forth above. However, any such alternative acquisition structure will involve a sale of all of the issued and outstanding stock of JWAH, which sale will be by the JWAH Sellers to Portals or a wholly-owned subsidiary of Portals. No such alternative acquisition structure will involve the sale of JWAH of the stock of the Companies owned by JWAH.

2. Upon execution by you and return to us of this Letter of Intent, our counsel will prepare a definitive purchase agreement ("Purchase Agreement"), execution of which shall be subject to approval by you and the Board of Directors of Portals and a definitive merger agreement ("Merger Agreement"), execution of which shall be subject to the approvals of the Boards of Directors of Portals, JWAH and the Companies. The Purchase Agreement and Merger Agreement will contain provisions customary in agreements relating to acquisitions of the type contemplated hereby, including customary representations and warranties with respect to the Companies, JWAH, and their businesses and capital stock, such as the absence of any undisclosed liabilities absolute or contingent and the delivery of good title to the shares, free and clear of all liens, encumbrances, claims, restrictions and rights of third parties, and indemnities from the Sellers and stockholders in respect of breaches of such representations and warranties which shall survive the closings for a period of at least two (2) years (longer for tax and certain other warranties). Portals may set-off against its obligation to make any Contingent Payment to the JWAH Sellers and stockholders such amounts as the JWAH Sellers and stockholders may be required to pay Portals pursuant to these indemnities, subject to an initial basket or cushion amount of $100,000. Consummation of the Stock Purchase and Merger will be subject to usual and customary conditions to be contained therein which will include the following:

(a) all requisite approval by the stockholders of the Companies and JWAH will have been obtained prior to the closings;

(b) all corporate authorizations and governmental or third party approvals or consents necessary in connection with the transaction contemplated hereby will have been obtained prior to the closings and will be in full force and effect;

(c) employment contracts, which will include non-competition and non-disclosure provisions, will be entered into between New Anderson and certain key employees of the Companies, including Richard K. Anderson;

(d) from and after the signing of the Purchase Agreement and prior to the closing thereof Portals shall have met with such salesmen and other key employees of the Companies as it may wish in its reasonable discretion, shall have found them to be generally acceptable for employment in Portals' reasonable discretion and, with possible exceptions specified in the Purchase Agreement, shall have obtained their

commitments to continued employment with New Anderson on terms similar to their existing employment terms (territory, customers and compensation subject to good performance) and the Companies will provide reasonable assurances to Portals that none of the existing principal stockholders who are parties to this Letter of Intent and certain key employees, to be identified in terms of functions, years of service, territory and gross sales in the Purchase Agreement, and no material number of employees or salesmen in the aggregate of the Companies or JWAH, as such terms are defined in the Purchase Agreement, will compete, directly or indirectly, with the business of New Anderson;

(e) there will have been no material adverse change in the business, properties, prospects or financial condition of the Companies and JWAH since March 31, 1987.

3. From and after the Merger closing and at least during the initial two-year Contingent Payment period, Portals will operate New Anderson as a separate subsidiary of Portals and will provide assurances that management of the Companies will be permitted to manage New Anderson as the Companies have been managed in the past. In addition, it is anticipated that the Anderson Chemical Companies Pension Plan and the profit sharing plans of the Companies, if in effect at the closing of the transactions, will be assumed by New Anderson, provided that such plans do not have any unfunded liabilities as of the Merger closing and the Companies, the JWAH Sellers and the other stockholders provide customary representations and warranties to such effect.

4. The parties hereto understand that satisfactory arrangements will be made with respect to all outstanding options, warrants and other rights to acquire shares of the equity securities or outstanding debt of the Companies and JWAH.

5. We understand that the Companies own life insurance policies (key man, split-dollar, and deferred compensation) on certain key employees with an aggregate cash surrender value to the Companies of $1,362,075.43 as of March 31, 1987, of which (i) $174,497.97 relates to certain split-dollar policies, the cash surrender value of which is payable to the Companies and the remaining death benefits of which are payable to the beneficiaries of the employees, and (ii) $58,307.27 relates to one policy which funds a certain nonqualified deferred compensation liability to a key employee. We further understand that it is the intention of the Companies to continue to pay all premiums on such policies and cause them to remain in effect from the date hereof until the Merger closing. You have represented to us that the aggregate cash surrender value (or the aggregate cash surrender value and death benefits) to the Companies as of that date will be at least $1,505,523.76, of which (i) at least $222,635.49 will relate to certain split-dollar policies and (ii) $58,307.27, possibly increased by a cash value increase as of the policy anniversary date, will relate to a single policy funding a certain deferred compensation obligation to W. Ray Benton. Following the Merger closing, New Anderson may, in Portals' sole discretion, cash in such insurance policies (with the possible exception of the split-dollar policies and nonqualified deferred compensation policy, on terms to be agreed by the parties) and use the proceeds therefrom for working capital or any other purposes. In Portals' discretion, the employees whose lives are insured may be given the right to purchase the policies on their respective lives for the cash surrender value of such policies.

6. Upon return of the fully executed Letter of Intent, we understand that you will make available to our representatives, including Peat Marwick Main & Co. and Baker & McKenzie, access to your premises and books and records, after normal business hours and under the supervision of your personnel, advisors, or both, and that you will furnish to us such financial and operating data and other information regarding the Companies as is relevant in connection with the proposed acquisition so as to permit us to make a thorough review of the financial conditions and businesses of the Companies. This access will be coordinated in advance with you, and to the maximum extent possible, the review will be conducted at a site other than your premises. Such review will continue during normal business hours after the signing of the Purchase Agreement and prior to the Merger closing, and we will expect to contact all of your key employees and certain of your vendors, customers, manufacturers and others with whom you do business. It is

understood that all such access, investigations and contacts would be conducted in such a manner as not to interfere with normal conduct of business of the Companies.

7. (a) The term "Confidential Information" shall mean all information furnished or to be furnished by the Companies to Portals in contemplation of the proposed acquisition. The term "Confidential Information" does not include information which (i) was already known to Portals before receipt thereof from the Companies, (ii) is learned by Portals from a third party which is authorized to disclose it (except information learned from any party contacted after the signing of the Purchase Agreement and prior to the Merger closing pursuant to Paragraph 6), or (iii) becomes generally available to the public other than as a result of a disclosure, whether intentional or inadvertent, by Portals or its agents.

(b) Portals will not use the Confidential Information in any way detrimental to the Companies, and Portals and its agents will keep such information strictly confidential and undisclosed; provided, however, that any of the Confidential Information may be disclosed to Portals directors, officers, employees or representatives and to individuals acting in similar capacities on behalf of Portals or its affiliates, who need to know the Confidential Information for the purpose of evaluating the proposed acquisition contemplated hereby. Portals will inform such directors, officers, employees and representatives of the confidential nature of the Confidential Information and will direct each of them to treat such information confidentially.

(c) In the event that Portals is required, by court order, law or regulation, to disclose any of the Confidential Information, Portals will promptly provide the Companies with notice of such order or requirement so that the Companies may seek an appropriate protective order.

(d) In the event that the proposed acquisition contemplated hereby is not effected, Portals will promptly, upon demand, deliver to the Companies the Confidential Information (including any notes or other writing embodying any Confidential Information) without exception and without retaining any copy thereof.

8. In consideration of the substantial expenditure of time, effort and expense to be undertaken immediately upon execution of the Letter of Intent, the JWAH Sellers, Messrs. Benton and Parker, the Companies and JWAH undertake and agree by executing this Letter of Intent (a) that they will not, between the time they execute this Letter of Intent and the Merger closing, initiate any discussions relating to the acquisition or merger of the Companies and JWAH with or by another corporation or corporations or the sale or other disposition of the Companies' equity securities, assets or business or any part thereof to any other person, and that during such time, if any other person makes an inquiry with respect to any such merger or sale, the JWAH Sellers, Messrs, Benton and Parker, the Companies and JWAH will immediately notify Portals of such inquiry and will keep Portals informed as to the status of any discussion resulting from such inquiry and (b) that they will use their best efforts to preserve intact the business organizations, employees, and existing business relationships. In this regard, the JWAH Sellers, Messrs. Benton and Parker, JWAH and the Companies agree that during the period from the time they execute this Letter of Intent to the closing they will conduct the businesses of the Companies and JWAH in the ordinary course and will not, without the prior written consent of Portals, (i) make any distributions to stockholders, (ii) issue any securities of the Companies and JWAH or any options, warrants or other rights to receive securities of the Companies and JWAH, (iii) effect any significant corporate action such as the commercial borrowing of any funds from any institutional lender, stockholder or related party for any purpose, a merger or consolidation, a sale of capital assets, the payment of any extraordinary bonus or material increase in any salary, or (iv) enter into any contract or commitment or take any other action not in the ordinary course of business. The parties agree that, in the event the parties have not entered into the Purchase Agreement and the Merger Agreement on or before January 31, 1988, the obligations set forth in this paragraph 8. shall terminate and be of no further force or effect.

9. Each party will bear its own transaction expenses, including legal and accounting fees, with respect to the matters contemplated hereby.

10. The parties will cooperate with all deliberate speed to sign the Purchase Agreement and Merger Agreement as soon as reasonably possible and close the Stock Purchase and Merger as soon as reasonably possible. We understand that the JWAH Sellers are the sole stockholders of JWAH and that JWAH, W. Ray Benton and Thomas B. Parker collectively are the principal stockholders of the Companies; by their execution of this Letter of Intent such parties hereby indicate their intent to proceed and to cause the Companies and JWAH to proceed on the terms set forth herein.

11. This letter constitutes only an expression of intent and shall not constitute a binding agreement between the signatories to consummate the transaction contemplated hereby; provided that paragraphs 6, 7, 8, and 9 hereof shall constitute binding agreements among the signatories upon the execution and delivery of this Letter of Intent. Consummation of the transactions contemplated hereby is specifically subject to the negotiation and execution of the definitive Purchase Agreement and Merger Agreement embodying the terms and conditions outlined herein and other usual and customary terms and conditions, and finally is subject to approval by the main Board of Directors of Portals Holdings PLC prior to the execution of the Purchase Agreement.

If the foregoing meets with your approval, please so signify by signing in the place provided below.

Very truly yours,

PORTALS WATER TREATMENT, INC.

By: [Signature] _____

Its: Director _____

AGREED AND ACCEPTED AS OF
THE ABOVE DATE;

ANDERSON CHEMICAL COMPANY, INC.

(s) Richard K. Anderson _____
Richard K. Anderson

By: (s) Richard K. Anderson _____

(s) W. Ray Benton _____
W. Ray Benton

Its: President _____

(s) Thomas B. Parker _____
Thomas B. Parker

ANDERSON CHEMICAL COMPANY OF
TEXAS, INC.

J.W. ANDERSON HOLDING CO.

By: (s) Richard K. Anderson _____

By: (s) Richard K. Anderson _____

Its: President _____

Its: President _____

ANDERSON CHEMICAL COMPANY OF
TENNESSEE, INC.

ESTATE OF JAMES W. ANDERSON

By: (s) Richard K. Anderson _____

By: (s) Richard K. Anderson _____

Its: President _____

Its: Executor _____

---

On November 14, 1987, Anderson Chemical assembled its employees in Macon, Georgia for a sales meeting, during which they were told by "Jet" Anderson that Anderson Chemical was being acquired by Portals, assured that their future employment was secure, and advised how to explain the change to Anderson Chemical cus-

tomers. Anderson Chemical customers were immediately notified that Anderson Chemical was being acquired by Portals. Other than telling customers that Anderson Chemical was being acquired by Portals, Anderson Chemical thereafter operated its businesses the same as it had before the announcement permitting Portals to do only what was agreed to in the November 9, 1987, writing.

At the time the November 9, 1987, writing was signed and on November 14, 1987, when employees were told of Portals' intent to acquire Anderson Chemical, plaintiffs and defendants contemplated the preparation and execution of a separate definitive purchase agreement which was never agreed upon in form or executed. Anderson Deposition, pp. 128, 131.

Between November 9 and December 21, 1987, Portals' top management in the United Kingdom further analyzed Wright Chemical Company's performance and future and further analyzed the acquisition of Anderson Chemical and concluded that it would be best for Portals to not acquire Anderson Chemical and to sell Wright. Portals, like all British companies, closed for the Christmas holidays. After the holidays the decision was finalized and its United States management was advised for the first time that the acquisition of Anderson Chemical would not be completed. Per instructions from top management, Portals' United States management telephoned "Jet" Anderson on January 7, 1988, and met with him on January 8, 1988, to advise him of Portals' decision not to acquire Anderson Chemical.

## Discussion

Plaintiffs' complaint includes thirteen counts seeking damages, among other things, for breach of contract, tortious interference with contractual and current and prospective business relations, promissory estoppel, conspiracy, breach of confidential relations, breach of fiduciary duty, and fraud and misrepresentation. Since most, if not all, of plaintiffs' claims are premised upon their claim of breach of contract, the first question to be decided is whether there was an enforceable contract.

## I. *Whether the November 9, 1987 writing is an enforceable contract.*

The only writing that was signed by the plaintiffs and the defendants is the writing of November 9, 1987. Plaintiffs suggest that if the November 9, 1987, letter in and of itself is not an enforceable contract, it should be construed in light of the verbal and written exchanges between the parties both before and after the November 9, 1987, letter was signed by the parties. They say in effect that "we were assured it was a deal; we believed it was a deal. The court should sift exhaustively through the depositions and exhibits and find the agreement that we thought we had."

In construing that writing, as the parties suggest, Georgia law applies. O.C.G.A. § 11-8-319, Georgia's Uniform Commercial Code statute of frauds pertaining to the sale of securities confines the evidence to be considered to the November 9, 1987 writing. Section 11-8-319 provides:

A contract for the sale of securities is not enforceable by way of action or defense unless

(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price.

It does not suffice to produce a document which specifies certain terms. The document must indicate that a contract has been made. However, it is not necessary that the writing itself be the contract. It need only indicate the existence of a contract.

Thus, "it would frustrate the Statute of Frauds ... [which requires a contract to be enforceable to be in writing] to search through the depositions [and the exhibits] in an effort to find [that an agreement existed]. If the existence of an agreement is not reflected in writing, it is unenforceable." *Southeastern Waste Treatment v.*

*Chem–Nuclear Systems*, 506 F.Supp. 944, 949 (N.D.Ga.1980). Therefore, the existence of an agreement for the sale of all the common stock of the plaintiff corporations must be reflected in the writing of November 9, 1987.

Under Georgia law, when a contract is plain and definite the construction of said contract is a matter of law to be submitted to the court for construction. *Sims' Crane Serv. v. Reliance Ins. Co.*, 514 F.Supp. 1033, 1036 (S.D.Ga.1981), aff'd, 667 F.2d 30 (11th Cir.1982). However, "no construction is required or permitted where the language of the contract is plain, unambiguous and capable of only one reasonable interpretation." *Petroziello v. United States Leasing Corp., EOS Leasing Div.*, 176 Ga.App. 858, 338 S.E.2d 63 (1985). "When clear and unambiguous, the contract is presumed to express the parties' intentions and will be enforced according to its terms." *Insurance Concepts, Inc. v. Western Life Ins. Co.*, 639 F.2d 1108 (5th Cir.1981). "[I]t must be construed by the court to mean what it says, 'the language used must be afforded its literal meaning and plain ordinary words given their usual significance.'" *Porter Coatings v. Stein Steel & Supply Co.*, 157 Ga.App. 260, 262, 277 S.E.2d 272, 274, aff'd, 247 Ga. 631, 278 S.E.2d 377 (1981).

The writing of November 9, 1987, is clear and unambiguous. It must therefore be construed to mean what it says, affording the plain ordinary language its normal and usual meaning. Keeping in mind that the parties voluntarily signed said writing, it expresses their intention and it must be enforced according to its terms.

Clearly and unambiguously the parties stated in paragraph 11:

This letter constitutes only an expression of intent and shall not constitute a binding agreement between the signatories to consummate the transaction contemplated hereby; provided that paragraphs 6, 7, 8, and 9 hereof shall constitute binding agreements among the signatories upon the execution and delivery of this Letter of Intent. Consummation of the transactions contemplated hereby is specifically subject to the negotiation and execution of the definitive Purchase Agreement and Merger Agreement embodying the terms and conditions outlined herein and other usual and customary terms and conditions, and finally is subject to approval by the main Board of Directors of Portals Holding PLC prior to the execution of the Purchase Agreement.

By that paragraph the parties first say that this entire letter is only an expression of intent and shall not constitute a binding agreement or contract to consummate the transaction contemplated hereby—the proposed purchase by Portals of the stock of the Anderson Chemical. Recognizing that some parts of the letter nevertheless create independent obligations, the parties next acknowledge that paragraphs 6, 7, 8 and 9 shall constitute binding agreements.

Paragraph 6 provides for Portals' lawyers and accountants to have access to Anderson Chemical's premises, books and records. Paragraph 7 provides for the confidentiality of information furnished to Portals. Paragraph 8 obligates the sellers to notify Portals of any other entity's expressed interest in acquiring Anderson Chemical and to operate in the usual manner pending completion of the transaction. Paragraph 9 obligates each party to pay its own transaction expenses, including legal and accounting fees. Neither individually nor collectively do any of those paragraphs constitute a contract to sell or purchase the stock of Anderson Chemical.

Furthermore, the latter part of paragraph 11 clearly conditions consummation of the proposed transaction upon the negotiation and execution of definitive purchase and merger agreements and approval by the Portals Holding PLC Board of Directors prior to the execution of the purchase agreement. Thus, the November 9, 1987 writing was not intended to be a binding contract.

That the November 9, 1987, writing was not intended to be a contract to sell the stock of Anderson Chemical is further indicated by other provisions of the writing, to wit:

(a) Paragraph 2 provides that Portals' counsel will prepare a definitive purchase agreement and a definitive merger agreement, *execution of which is subject to approval by purchasers and sellers and their respective boards of directors.*

(b) Paragraph 6, the furnishing of confidential information to Portals' paragraph, provides that "(d) [i]n the event that the **proposed acquisition contemplated hereby is not effected**, Portals will promptly, upon demand, deliver to [Anderson] ... the confidential information...."

(c) Paragraph 8 provided:

The parties agree that, in the event the parties have not entered into the Purchase Agreement and the Merger Agreement on or before January 31, 1988, the obligations set forth in this paragraph 8 shall terminate and be of no further force or effect.

These provisions unequivocally show that definitive purchase and merger agreements, the terms of which were to be agreed upon and approved by sellers and purchasers and their boards of directors, were to be prepared. These provisions further show that the sellers and the purchasers and their boards of directors reserved the right to approve, and thus the right to disapprove, of the provisions of each of the agreements. In the event either or both parties failed to approve, these provisions specified a date that ended the efforts to effect agreement and specified the then remaining obligations of the parties. The parties thus contemplated that they might fail to agree on the terms and conditions of a definitive purchase and/or merger agreement or might fail to secure the necessary approval. They agreed between themselves that their obligations would then be—only paragraphs 6, 7, 8 and 9.

The writing of November 9, 1987, is nothing more than a letter contemplating subsequent definitive purchase and merger agreements and also contemplating approval of the execution of each agreement by the purchasers and sellers and their respective boards of directors. "Where it is evident from a written instrument, that the parties contemplated that it was incomplete, and that a binding agreement would be made subsequently, there is no agreement." *Hartrampf v. Citizens & Southern Realty Investors*, 157 Ga.App. 879, 278 S.E.2d 750, 752 (1981), *citing Board of Drainage Commissioners v. Karr & Moore*, 157 Ga. 284, 299, 121 S.E. 298 (1924). *See also Russell v. City of Atlanta*, 103 Ga.App. 365, 119 S.E.2d 143, 145 (1961). Since the terms of the definitive agreements were not specified but were to be agreed upon by the plaintiffs and defendants, there was nothing for either the plaintiffs, defendants or their respective boards of directors to approve prior to the definitive agreements being prepared to the satisfaction of plaintiffs and defendants. "The binding quality of a writing depends on the intent of the parties ... The parties are masters of their affairs. They may elect not to be bound by writings, however found; they also may elect to be bound by writings that call for subsequent memorials." *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir.1987) In this formal writing of November 9, 1987, the parties elected not to be bound. The agreement in the present case unambiguously contemplated resolution of additional items before execution of the final contract.

Plaintiffs argue that Paragraphs 10 and 11 are contradictory because "Paragraph 10 creates an affirmative duty to sign and close, and Paragraph 11 takes it away." Thus, they argue that Paragraph 10 must be given effect over Paragraph 11. Plaintiffs' contention is unavailing. Paragraph 10 provides:

The parties will cooperate with all deliberate speed to sign the Purchase Agreement and Merger Agreement as soon as reasonably possible and close the Stock Purchase and Merger as soon as reasonably possible. We understand that the JWAH Sellers are the stole stockholders of JWAH and that JWAH, W. Ray Benton and Thomas B. Parker collectively are the principal stockholders of the Companies; by their execution of this Letter of Intent such parties hereby indicate their intent to proceed and to cause

the Companies and JWAH to proceed on the terms set forth herein.

In this court's considered judgment Paragraph 10 does nothing more than require each party to proceed with the contemplated transaction in accordance with the framework as set out in the November 9, 1987, writing. Paragraph 10 does not create an obligation on the part of either party to consummate the transaction. Plaintiffs would have this court latch on to the first sentence of Paragraph 10 and find a contract in the face of language throughout the writing indicating to the contrary. This court declines to do so.

The November 9, 1987, writing is clearly a letter agreement not intended by the parties thereto to be a binding, enforceable contract for the sale of the common stock of the plaintiff corporations. It is, therefore, not an enforceable contract.

## Other Contentions

### II. Confidential Relationship

■ Alternatively, plaintiffs contend they should be relieved of the rigid requirements of the Statute of Frauds because of an alleged confidential or fiduciary relationship. The Georgia Code defines confidential relations as follows:

> Any relations shall be deemed confidential, arising from nature or created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where from similar relations of mutual confidence, the law requires the utmost good faith; such as partners, principal and agent, etc.

O.C.G.A. 23–2–58.

Plaintiffs contend that under the circumstances of this case "the inter-actions and dealings of the parties, their expressed common goal, the control exerted by defendants over plaintiffs and their relationship of trust and rapport established over the course of the transaction, the joint efforts of Roberts, Knowles, Anderson and others to complete this transaction, and defendants' actions in refusing to comply with the agreement, it is incontrovertible that

the evidence before this court proves as a matter of law the parties had a "relationship in fact which justifies the reposing of confidence by one party in another...." (citation omitted).

Under Georgia law there is never a presumption of a confidential relationship. The burden is upon the party asserting the same to establish its existence. *Crawford v. Crawford,* 134 Ga. 114, 67 S.E. 673 (1910). In order for section 23–2–58 to be applicable, a definite fiduciary relationship must exist between plaintiff and the other party. The mere fact that one reposes trust and confidence in another does not create a confidential relationship. "In the majority of business dealings, opposite parties have trust and confidence in each other's integrity, but there is no confidential relationship by this alone." *Kienel v. Lanier,* 190 Ga.App. 201, 378 S.E.2d 359, 361 (1989). As was the case in *Kienel,* the instant case does not involve a transaction in which the parties joined together, as partners, promoters, joint venturers, or otherwise to achieve a common business objective. Here the parties were engaged in an arms length transaction with each other in an effort to further their own separate business objectives. Thus, under the circumstances, the court cannot find that a confidential relationship existed between plaintiff and defendant.

While neither party has addressed the question of whether or not the language of the Statute of Frauds forecloses plaintiffs relying upon an alleged confidential relationship to get around the statute, it is apparent to the court that the legislature of this state by enacting the Statute of Frauds and including therein enumerated exceptions—discussed as to promissory estoppel—has foreclosed all other unmentioned exceptions, including those encompassed by the concept of a confidential or fiduciary relationship. It is also, therefore, unavailable to plaintiffs.

### III. Part Performance

■ The Statute of Frauds being applicable, plaintiffs nevertheless generally contend that their part performance of the

contract removes it from the Statute of Frauds. In particular, plaintiffs contend that in reliance on the writing of November 9, 1987, they divulged significant confidential financial information to defendant; publicly announced they were being acquired by defendants; revealed their product lines and formulas to defendants; allowed defendants to meet with plaintiffs' customers; and gave defendants great control of plaintiff businesses—all in reliance upon their belief that the November 9, 1987, writing was a contract to sell.

Under Georgia law, part performance to take an oral agreement out of the Statute of Frauds, "must be a part performance of the contract, and the doing by either party of some independent act, not a part of the contract, does not become a part performance because the doer was led so to act by his belief that the parol contract would be performed by the other party ... [A]nything done which is outside the limits of the contract, and which did not enter into the consideration of the agreement between the parties, is insufficient to cause the case to fall within the exception to the statute...." *Hotel Candler, Inc. v. Candler,* 198 Ga. 339, 347–349, 31 S.E.2d 693, 698–99 (1944). Such performance done even upon the advice of the other party does not alter the rule. *Cofer v. Wofford Oil Co. of Ga.,* 85 Ga.App. 444, 450, 69 S.E.2d 674, 678 (1952). The acts of the plaintiffs do not begin to amount to such part performance.

The contract that plaintiffs seek in vain to establish would be for the sale by the plaintiffs and the purchase by the defendants of all the common stock of the plaintiff corporations. The acts that plaintiffs allege were in part performance of that agreement in no way interfered with, in no way divested any part of plaintiffs' ownership and day-to-day control and operation of Anderson Chemical, nor did those acts give defendants any access to plaintiffs' business other than to be furnished with due diligence information preparatory to the parties attempting to agree on a purchase agreement. In reality, all that plaintiffs did "was preparation for performance, and not part performance of the contract itself, and was not sufficient to remove the case from the statute of frauds." *Id.* at 450, 69 S.E.2d 674 (citations omitted).

It is well to remember that "it is not every part performance of the contract that will take it without the statute of frauds. It is only where there has been such part performance as would render it a fraud of the party refusing to comply if the court did not compel a performance...." *Hotel Candler Inc. v. Candler,* 198 Ga. at 350, 31 S.E.2d 693 (citations omitted).

## IV. *Promissory Estoppel*

The standard definition of promissory estoppel, as plaintiffs in their brief pointed out, is found in O.C.G.A. § 13–3–44(a), to wit:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*See also* Restatement (Second) of Contracts § 90(1) (1981) (same language). *Insilco Corp. v. First National Bank,* 248 Ga. 322, 283 S.E.2d 262 (1981); *Irvin v. Lowe's of Gainesville, Inc.,* 165 Ga.App. 828, 302 S.E.2d 734 (1983). Plaintiffs contend they reasonably relied to their detriment upon each of the following representations of the defendants:

1. The representation and promise in paragraph 10 of the November 9, 1987, writing that defendants would "cooperate with all deliberate speed to sign the Purchase Agreement and Merger Agreement as soon as reasonably possible and close the Stock Purchase and Merger as soon as reasonably possible...."

2. Portals' representatives' advice to Mr. Anderson on September 2, 1987, that while Portals was unwilling to pay earnest money, Mr. Anderson should realize that signing the letter of intent was sufficient because if Portals said they would do something, they would go through with the acquisition.

**1582**

3. Portals' representatives on October 23, 1987, told Mr. Anderson that Portals U.K. had approved the acquisition.

4. Portals' representatives advised Mr. Anderson they had an agreement in principle.

5. Portals' representatives, at the November 14, 1987, meeting of employees and stockholders, represented that plaintiff companies had been sold to the Portals group.

6. Portals' representatives suggested sending and helped draft a letter to Anderson's customers announcing that plaintiff companies were joining the Portals group.

7. At a December 10, 1987, meeting Portals' representatives advised that all details with regard to the Purchase Agreement had been worked out, that they had a deal, and that there were no open issues.

What action did plaintiffs take or forebear on account of any or all of these representations? In their August 29, 1989, brief they state, "Anderson relied on these representations and concealments and proceeded to waste time and money in pursuing this acquisition...." Plaintiffs' Brief, p. 52.

■ As defendants suggest, there are several impediments to plaintiffs' claim of promissory estoppel. First, O.C.G.A. § 11–8–319, the Statute of Frauds applicable to this securities transaction contains in sections (b) through (d) an enumeration of the circumstances in which the hardships imposed by the Statute of Frauds will be alleviated, to wit:

A contract for the sale of securities is not enforceable by way of action or defense unless:

(a) There is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity or described securities at a defined or stated price; or

(b) Delivery of the security has been accepted or payment has been made but the contract is enforceable under this provision only to the extent of such delivery or payment; or

(c) Within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) of this Code section has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt; or

(d) The party against whom enforcement is sought admits in his pleading, testimony, or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price. (Code 1933, § 109A–8–319, enacted by Ga.L.1962, p. 156, § 1).

Those enumerated circumstances do not include promissory estoppel. Promissory estoppel is thus unavailable to plaintiffs in their effort to be relieved of the burden of proving an enforceable written agreement. See Smith v. Baker, 715 S.W.2d 890 (Ky. Ct.App.1986); Thomas v. Prewitt, 355 So.2d 657 (Miss.1978).

■ Moreover, with due respect to plaintiffs' understandable distress over not being acquired for $13,400,000, even if promissory estoppel were available to take a case out of the Statute of Frauds, it would not be available in this instance. The forbearance that promissory estoppel will remedy is more than wasting time and money pursuing a possible acquisition, especially when the complaining party has agreed in writing to "bear its own transaction expenses, including legal and accounting fees ...," (Paragraph 9 of November 9, 1987, writing). The time and money allegedly wasted by plaintiff is no more than was contemplated by the writing of November 9th. "The doctrine of estoppel in pais is predicated upon a change of position to the hurt of one of the parties acting on the representations or conduct of the other." Lynch v. Poole, 138 Ga. 303, 305, 75 S.E. 158, 159 (1912). Morgan v. Maddox, 216 Ga. 816, 120 S.E.2d 183, 186 (1961). Thus, while plaintiffs may have spent money and time in pursuing this failed transaction,

they did not suffer the hurt contemplated by promissory estoppel.

■ Finally, if promissory estoppel were applicable, the reliance of plaintiff must be reasonable. The question of whether or not plaintiffs' reliance was reasonable is one for the court to decide. *Atkinson v. American Agency Life Ins. Co.*, 165 Ga. App. 102, 299 S.E.2d 600 (1983). In the court's considered judgment, to rely upon the writing of November 9, 1987, which, as already pointed out, is plainly and unambiguously a non-binding agreement to agree, is unreasonable. Despite their assertions to the contrary, whatever actions plaintiffs took during the course of this transaction, they took knowing the November 9, 1987, writing was only an expression of intent and not a binding agreement. There can be no reasonable reliance upon an unenforceable promise—the November 9, 1987, writing. *American Viking Contractors, Inc. v. Scribner Equipment Co.*, 745 F.2d 1365, 1372 (11th Cir.1984).

The court further finds that plaintiffs' reliance upon any oral representations allegedly made by defendants' representatives was not reasonable. There can be no reasonable reliance by an experienced businessman in light of oral representations directly contrary to limiting terms of a written agreement. *Runnemede Owners, Inc. v. Crest Mortgage Corp.*, 861 F.2d 1053, 1058–59 (7th Cir.1988). For all these reasons, promissory estoppel is not a remedy available to plaintiffs.

## V. *Fraud and Misrepresentation*

■ Plaintiffs also allege they were defrauded when defendants made promises without a present intent to perform. In particular, plaintiffs contend that the principals, members of the Board of Directors of Portals Holding PLC, determined between March and May, 1987, to sell Wright and remove themselves from the water specialty chemical treatment business in the United States, and as a result, never intended to acquire Anderson Chemical. Despite this decision, defendants' principals authorized Knowles, Roberts, Williamson and Van Gundy to investigate acquisitions in the United States to supplement Wright's business and to conduct negotiations on behalf of Portals. Defendants did not reveal to their negotiators, or to Anderson, that they had decided to sell Wright and, thus, not acquire Anderson Chemical. Nevertheless, defendants made, allowed, and authorized repeated misrepresentations of these facts and others to plaintiffs with the intent to induce plaintiffs to enter into the contract, with no present intention of performing. Plaintiffs contend that under these facts, defendants conduct constituted fraud and misrepresentation as a matter of law.

Under Georgia law the essential elements of fraud are: (1) the defendant made the representation; (2) he knew the representation was false at the time; (3) he made it with the intention and purpose of deceiving the plaintiff; (4) the plaintiff reasonably relied upon the representation; (5) the plaintiff sustained the alleged loss and damage as a proximate result of the defendant's representation. *Morrison v. Hayes*, 176 Ga.App. 128, 130, 335 S.E.2d 596, 598 (1985). In essence, plaintiffs say Portals had a duty to disclose its secret intentions to the plaintiffs; their failure to disclose caused plaintiffs to rely, to their detriment, upon the representations and promises set forth in the November 9, 1987, writing. Defendants thus made promises without a present intent to perform and concealed material facts from plaintiffs, thereby defrauding plaintiffs.

Defendants assert that even if defendants, as alleged, failed to disclose their secret intentions, plaintiffs have not set forth a cause of action for fraud. Defendants contend that plaintiffs have no evidence to establish justifiable reliance—one of the five essential elements of fraud. Because Georgia law requires justifiable reliance on the alleged misrepresentations, a court can determine as a matter of law whether the reliance is justifiable or reasonable. Under Georgia law, *there can be no reasonable reliance on an unenforceable promise,* and accordingly no claim for fraud. *American Viking Contractors, Inc.*, 745 F.2d at 1372. Furthermore,

"where a contract is unenforceable, an action for damages cannot be maintained on the ground of fraud in refusing to perform the contract, even though the promisor at the time of making the oral contract may have had no intention of performing it." *Pelletier v. Stuart–James Co., Inc.*, 863 F.2d 1550, 1555–56 (11th Cir.1989).

The only written promises made by plaintiffs and defendants as to the purchase of the common stock of plaintiff corporation are those set forth in the November 9, 1987, writing, already found to be merely an unenforceable letter of intent. As stated supra, any reliance on oral representations in the face of the clear language of the November 9, 1987 writing is unreasonable. Consequently, plaintiffs have failed to prove fraud, inceptive or otherwise.

### VI. *Tortious Interference or Conspiracy*

█ Plaintiffs have brought various tort claims against defendants for conspiracy to interfere and interfering with the current and prospective business and contractual relations between Portals and Anderson Chemical, and in conspiring to induce and inducing breach of contract. Plaintiffs' duplicative claims for tortious interference with contract, conspiracy to induce breach of contract depend on an enforceable contract. The law of Georgia is clear that where the purported contract is not enforceable, no action for tortious interference with contractual rights exist. *Dickens v. Calhoun First National Bank*, 189 Ga.App. 798, 377 S.E.2d 715 (1989). The court having determined that the November 9, 1987, writing is not an enforceable contract, those claims are without merit.

█ In their other claims plaintiffs contend that Portals Holdings PLC wrongfully withheld their approval and thus tortiously interfered with Anderson Chemical's business relations. In order to establish a cause of action for malicious interference with business relations, a plaintiff must demonstrate that the defendant (1) acted improperly and without privilege; (2) purposely and with malice with intent to injure; (3) induced a third party or parties not to enter into or continue a business relationship with plaintiff; and (4) that plaintiff suffered some financial injury. *Hayes v. Irwin*, 541 F.Supp. 397, 429 (1982), aff'd, 729 F.2d. 1466 (11th Cir.1984). The November 9, 1987, writing signed by the parties provided that the proposed transaction was subject to approval of the Board of Directors of Portals Holdings, PLC. In the instant case, Portals merely exercised its right not to approve the transaction. Thus, Portals did not act improperly and without privilege. "There is no liability for interference with a contractual relationship where the alleged interference is caused by the exercise of an absolute right." *Rebel Sales Company, Inc. v. McDuffie & Assoc., Inc.*, 142 Ga.App. 693, 237 S.E.2d 6, 7 (1977), citing *Schaeffer v. King*, 223 Ga. 468, 155 S.E.2d 815 (1967). Moreover, tortious interference claims require the action of a third party, and this requirement cannot be satisfied by the action of the wholly-owned subsidiary and its parent. *Morast v. Lance*, 807 F.2d 926, 933 (11th Cir.1987). In this case where defendants have a relationship of wholly-owned subsidiary and parent, no cause of action for tortious interference with contract can exist.

Plaintiffs other contentions—slightly different, overlapping and repetitious—and defendants responses thereto have also been carefully considered. They also are without merit.

For the reasons stated above, the court finds that there is no genuine issue of material fact, and defendants are entitled to judgment as a matter of law on each of plaintiffs' claims. Accordingly, defendants' motion for summary judgment is hereby GRANTED. Plaintiffs' cross motion for summary judgment is DENIED.

SO ORDERED.